638 S.E.2d 685

**COLLETON COUNTY TAXPAYERS ASSOCIATION, Edisto Beach Property Owners Association, Inc., South Carolina Public Interest Foundation, David Cannon, Joseph Mire, Marion Rizer, and Randy White, individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

**The SCHOOL DISTRICT OF COLLETON COUNTY, Superintendent Charles W. Gale, Jr., SCAGO Educational Facilities Corporation for Colleton School District, Miles Crosby, Rachel Farris, Redell Fields, P.A. Pournelle, III, and Wayne Shider, Defendants.**

No. 26240.

Supreme Court of South Carolina.

Heard Oct. 31, 2006.
Decided Dec. 11, 2006.

James G. Carpenter, of the Carpenter Law Firm, of Greenville, for Plaintiffs.

Francenia B. Heizer, Robert L. Widener, and Paul D. Harrill, all of McNair Law Firm, of Columbia, for Defendants.

Chief Justice TOAL:

This original jurisdiction case involves a contractual arrangement entered into by the School District of Colleton County ("the School District") and whether this arrangement is illegal in light of the South Carolina Constitution's limits on the amount of debt a public school district may incur. We hold that the arrangement complies with the relevant constitutional provisions and statutes.

## FACTUAL/PROCEDURAL BACKGROUND

In September 2006, the School District adopted a complicated resolution designed to renovate its existing public school facilities and acquire new public school facilities.[1] In its simplest terms, this resolution is an agreement between the School District and the South Carolina Association of Governmental Organizations ("SCAGO").

Under the resolution, SCAGO is obligated to create a nonprofit corporation ("the Corporation") which will fund the renovation and construction of the county's public schools.

---

1. The School District adopted a similar resolution in July 2006. At the relevant September meeting, the Board repealed the previous resolution and enacted the one at issue.

The resolution requires the School District to convey the existing school facilities to the Corporation and to lease the land on which these facilities sit to the Corporation.[2] The Corporation will then issue corporate revenue bonds to fund the renovation of the existing facilities and the construction of new school facilities, and will also appoint the School District as the Corporation's agent to oversee the renovation and construction. The resolution further provides that the School District may purchase the renovated or newly constructed facilities by making annual installment payments to the Corporation.[3]

In August 2006, several Colleton County citizens and taxpayer organizations ("Plaintiffs") sued the School District and the other Defendants (collectively "Defendants") in the circuit court for Colleton County. This suit requested that the court declare that the resolution and its attendant agreements contained numerous violations of the South Carolina Consolidated Procurement Code, see S.C.Code Ann. §§ 11-35-10 to -5270 (Supp.2005), and that the scheme constituted a "financing agreement" which would impact the amount of the School District's outstanding general obligation debt.[4] The Plaintiffs contemporaneously requested a temporary restraining order to stop the School District from issuing general obligation bonds to raise cash for its first installment payment. The circuit court heard this motion the same day the Plaintiffs filed the complaint and denied the request the following day.

---

2. This process is detailed in the document titled "Base Lease and Conveyance Agreement."

3. The resolution and its attendant agreements anticipate that the Corporation will issue approximately $90 million worth of bonds to fund the renovation and construction. The repurchasing process is detailed in the document titled "Installment Purchase and Use Agreement."

4. The South Carolina Constitution provides that a public school district may incur general obligation debt only in an amount less than or equal to the value of eight percent of the total assessed property value in that district unless a majority of voters in the school district, by referendum, provide otherwise. S.C. Const. art. X, §§ 15(5) and (6). This value for the School District is approximately $12 million. The date of the Plaintiffs' complaint precedes the resolution at issue in this case because the Plaintiffs originally challenged the first resolution enacted by the School District.

At the Defendants' request, this Court removed this case from the circuit court and agreed to hear the matter in the Court's original jurisdiction. Following the grant of original jurisdiction, this Court accepted additional pleadings regarding summary judgment as well as an amended complaint and a supplemental answer. Accordingly, all issues before the Court involve competing requests for declaratory judgments raised either by the unresolved motion for summary judgment or the amended complaint and answer.[5]

The parties present the following issues for review:

I. Do the resolution and its attendant agreements constitute a "financing agreement," and if so, has the School District exceeded its allowable amount of outstanding general obligation debt?

II. Do the resolution and its attendant agreements violate the terms of two prior referenda?

III. Is the Corporation the agent or alter-ego of the School District and thus subject to the South Carolina Constitution's outstanding general obligation debt limit?

IV. Do the resolution and its attendant agreements violate the School District's procurement code and is the School District's "professional services exception" to its procurement code valid?

V. Did the School District have a "valid public purpose" for its September issuance of general obligation bonds? [6]

---

**5.** The Defendants' original and amended answers contain counterclaims for declaratory judgments that the resolution and its attendant agreements do not violate the relevant procurement procedures and that the scheme does not impermissibly impact the amount of the School District's outstanding general obligation debt.

**6.** This catalogue of the issues differs slightly from the manner in which the parties organized their briefs. We have listed the issues according to the causes of action presented in the Plaintiffs' amended complaint. For the sake of convenience, we have grouped the Plaintiff's fourth, fifth, sixth, seventh, and eighth causes of action together under Issue IV, which deals with the School District's procurement code. Similarly, the Plaintiffs' ninth cause of action, which deals with whether the School District or the Corporation is the entity ultimately responsible for the school renovation and construction, falls under Issues III (alter-ego) and IV (procurement code).

## Law/Analysis

 "A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Felts v. Richland County*, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). This case primarily involves the interpretation of statutes, which are questions of law. *Charleston County Parks & Recreation Comm'n v. Somers*, 319 S.C. 65, 67, 459 S.E.2d 841, 843 (1995).

### I. Financing Agreement/Constitutional Debt Limit

 The Plaintiffs argue that the resolution and its attendant agreements constitute a "financing agreement" and that the School District has exceeded its allowable amount of outstanding general obligation debt. We disagree.

S.C.Code Ann. § 11–27–110(B) (Supp.2005) provides that unless a governmental entity obtains voter approval, the entity may not enter into a "financing agreement" if the sum of the "principal balance" of the financing agreement and the amount of the entity's outstanding bonded debt at the time of execution exceeds eight percent of the assessed value of taxable property in the entity's jurisdiction.[7] The Code defines a "financing agreement" in section 11–27–110(A)(6), and it is undisputed that the agreement at issue in this case does not qualify as a financing agreement under the version of the statute reproduced in the 2005 Code Supplement.[8]

---

7. Thus, this statute parallels the South Carolina Constitution's limit on the amount of bonded debt a school district may carry.

8. Specifically, this version of the statute provides that a financing agreement means a contract under which a governmental entity (1) acquires the use of an asset, (2) makes payments in more than one fiscal year, (3) divides the payments into principal and interest components, and (4) acquires title to the asset if all scheduled payments are made. S.C.Code Ann. § 11–27–110(A)(6) (Supp.2005). The agreements at issue here meet requirements one and two, however, the agreements do not provide for payments to be divided into principal and interest components.

 Furthermore, under these agreements, title to the renovated and newly constructed school facilities is not contingent upon the School District's satisfying the entire amount of corporate bonds issued by the Corporation. Instead, the Corporation transfers title to an undivided interest in the facilities to the School District each time a payment is made.

Act No. 388 of 2006, however, substantially revised § 11–27–110(A)(6), and it is these revisions that have led to the current dispute. Under revised § 11–27–110(A)(6), a financing agreement includes:

> any [contract] entered into after August 31, 2006, *pursuant to which installment payments of the purchase price are to be paid* by a school district or other political subdivision to a non-profit corporation, political subdivision, or any other entity, *from any source other than the issuance of general obligation indebtedness by the school district,* in order to finance the acquisition, construction, renovation, or repair of school buildings or other school facilities.

Part V, Section 4, Act No. 388, 2006 S.C. Acts 3133, 3166–68 (emphasis added). The Plaintiffs allege the resolution and its attendant agreements meet this definition.[9]

As the statute instructs, the application of the revised definition of a "financing agreement" in this case turns on the source of the funds that the School District will use to make installment payments to the Corporation. The Plaintiffs argue that although the School District manifests an intention to use constitutionally permissible amounts of general obligation debt to raise funds for the installment payments, the agreements use permissive terms that do not restrict the School District to using only general obligation debt. To counter, the School District argues that it intends to make installment payments using only funds derived from the issuance of general obligation debt, and that the permissive terms are used exclusively to protect the School District's rights (1) to opt out of making the payments at any time (an event generally referred to as "non-appropriation") and (2) to use other funds that may be appropriated by another entity for this purpose in the future.

---

9. Revised § 11–27–110(A)(6) provides additional definitions of arrangements that constitute financing agreements. These definitions include:

> any contract entered into after December 31, 2006, pursuant to which installment payments of the purchase price are to be paid by a school district or other political subdivision to a non-profit corporation ... in order to finance the acquisition, construction, renovation, or repair of school buildings or other school facilities.

*Id.* The School District does not dispute that the resolution and its attendant agreements would meet the definition of a financing agreement if executed after December 31, 2006.

A close examination of the scheme here at issue reveals no violations of the relevant constitutional or statutory provisions. The resolution and its attendant agreements specifically provide that the School District is not obligated to make any payments to the Corporation unless the School District appropriates funds for that purpose. Furthermore, unless and until the School District appropriates funds for an installment payment from a source other than the issuance of general obligation indebtedness, this claim is speculative and thus not ripe for judicial review. *See Waters v. South Carolina Land Res. Conservation Comm'n,* 321 S.C. 219, 227, 467 S.E.2d 913, 917–18 (1996) (stating that an issue that is contingent, hypothetical, or abstract is not ripe for judicial review).

The crux of the Plaintiffs claim goes to the fund raising/repayment scheme on which they allege the School District plans to embark. To make installment payments to the Corporation, the Plaintiffs allege that the School District plans to use revenues to retire a portion of its outstanding general obligation debt, and then issue new general obligation bonds to raise proceeds for the installment payments. The Plaintiffs assert that this bond retirement/re-issuance scheme will occur on an annual basis, and that this process violates § 11–27–110(A)(6)'s requirement that, to avoid classification as a "financing agreement," the installment payments must come from "the issuance of general obligation indebtedness."

While not entirely unpersuasive, this argument overlooks the inescapable fact that the scheme put in place by the resolution and its attendant agreements complies with the letter of the statute's requirements. Undoubtedly, a school district possesses the authority and ability to use revenue to retire a portion of its general obligation debt. Furthermore, the law clearly supports the proposition that a school district may incur general obligation debt provided the school district remains within the constitutional and statutory limits. We are aware of no authority permitting this Court to regulate a school district's activities of this type absent a violation of a constitutional or statutory limitation.

Our jurisprudence in a similar area supports this conclusion. On several prior occasions, numerous South Carolina school systems have struggled with how to finance their infrastruc-

tural growth while remaining within the boundaries of their constitutional and statutory general obligation debt limitations. At one time, alternative financing arrangements known as "lease-purchase" agreements were a popular means by which school districts sought to achieve these goals. Under these agreements, a school district would typically lease its land and buildings to a non-profit corporation for a long period of time. After execution of the lease, the corporation would privately raise funds to finance the school renovation and construction, and the corporation would lease the new and renovated facilities back to the school district until the school district had repaid the principal and interest necessary to fund the construction.

As occurred in the instant case, taxpayers challenged these arrangements as violating the relevant limits on a school district's general obligation indebtedness. In both *Redmond v. Lexington County Sch. Dist. No. Four*, 314 S.C. 431, 445 S.E.2d 441 (1994), and *Caddell v. Lexington County Sch. Dist. No. 1*, 296 S.C. 397, 373 S.E.2d 598 (1988), this Court held that lease-purchase arrangements did not constitute general obligation debt as defined under Article X, § 15 of the South Carolina Constitution. *Caddell* represents this Court's first pronouncement on the subject, and in that case, the Court began by examining the Constitution's definition of general obligation debt. 296 S.C. at 399–400, 373 S.E.2d at 599. Noting that this definition included only debt that is "secured ... by a pledge of [the school district's] full faith, credit and taxing power," this Court held that the lease-purchase agreements did not implicate the school district's constitutional debt limit. *Id.* at 400, 373 S.E.2d at 599. The Court stated:

In its historical context, general obligation debt refers to that which is "ultimately secured by taxes on the property within the political entity." Thus, general obligation debt embraces neither yearly expenses payable from current revenues nor contingent liabilities of the governmental entity. This is so because the governmental entity is not obligated to impose property taxes for their payment.
\* \* \*

Similarly, a leaseback arrangement containing an explicit non-appropriation clause places no such requirement on the political entity.... Liability under the leaseback arrange-

ment is, at most contingent: The District has the option of terminating simply by refusing to appropriate money for rent.

*Id.* (footnotes omitted).

Although the instant case involves an "installment-purchase" agreement and not a "lease-purchase" agreement, we believe that much of *Caddell's* reasoning nonetheless applies. As we stated in *Caddell*, and reiterated in Redmond:

> The premise of the plaintiffs' argument that the plan for financing and construction ... is a fraud or works an injustice upon the city's taxpayers is that it is a device to accomplish, by change of form with no change of substance, the same result which has been rejected by the voters. This premise is faulty. It is not the construction ... for which voter approval is required.... Rather, it is the creation of a general obligation debt ... which requires the assent of the voters. The plan submitted to and rejected by the voters would have created such a general obligation debt. The plan now proposed does not. This difference is constitutionally significant.

*Redmond*, 314 S.C. at 434, 445 S.E.2d at 443; *Caddell*, 296 S.C. at 401–02, 373 S.E.2d at 600 (quoting *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo.1981) (internal citations and internal emphasis omitted)).

Although it presented the identical issue dealt with in *Caddell*, *Redmond* is particularly informative because it added the element of an expression of legislative dissatisfaction with school districts' use of lease-purchase arrangements. Specifically, at the time this Court rendered its decision in *Redmond*, legislation requiring that the amount expended in a lease-purchase agreement be counted towards a school district's general obligation debt limit had passed the South Carolina Senate and was under consideration in the South Carolina House of Representatives. *See Redmond*, 314 S.C. at 434–35, 445 S.E.2d at 443. This Court stated, "[i]f this bill is eventually passed ... the Defendant's position will obviously not merit the same result reached in *Caddell* and in this case. Until the legislature has definitively spoken on this issue, however, we must apply the law as it currently exists." *Id.*

Turning to the instant case, revised § 11–27–110(A)(6), particularly the definition in effect after this coming December 31, clearly represents a legislative pronouncement of the type discussed in *Redmond.* Unlike *Redmond,* this case involves legislation which has been passed by the Legislature, signed by the Governor, and is now effective. However, as in *Redmond,* the instant case involves a scheme which complies with the letter of the statutes currently in effect.

The portion of § 11–27–110(A)(6) currently in effect requires only that the school district use funds derived from the issuance of general obligation debt to make payments under an installment-purchase agreement. So long as the School District abides by this requirement, they have not violated the statute's requirements.

Accordingly, we deny the Plaintiffs' request for a declaratory judgment that the resolution and its attendant agreements are "financing agreements" which implicate the School District's constitutional and statutory debt limits. Additionally, and in accordance with the Defendants' request, we hereby issue a declaratory judgment that the resolution and its attendant agreements are in compliance with the relevant constitutional and statutory provisions and limitations.

## II. Violations of Prior Referenda

The Plaintiffs argue that the resolution and its attendant agreements violate the results of two prior referenda which denied the School District the right to exceed its general obligation debt limit. We disagree.

In 1998, the citizens of Colleton County rejected a referendum which would have allowed the School District to issue approximately $42 million in general obligation bonds; well in excess of the School District's general obligation debt limit. Similarly, in 1999, voters rejected a resolution which would have allowed the School District to issue approximately $39.5 million in general obligation bonds. The Plaintiffs claim that a decision of the School District which results in an increase of the School District's general obligation debt beyond its debt limit violates the results of these referenda.

We hold that this claim does not state a cause of action. The relevant question is whether the School District has

violated the constitutional or statutory limits on the amount of outstanding general obligation debt it may incur. The Plaintiffs provide no authority supporting the proposition that a referendum which is wholly rejected (and therefore a nullity) can form the basis of a legal claim.

Accordingly, we grant the Defendants' motion for summary judgment as to this claim on the grounds that it fails to state a cause of action.

### III. Alter–Ego/Agency

The Plaintiffs argue that the Corporation is the alter-ego of the School District. Accordingly, the Plaintiffs argue that the Corporation is subject to the general obligation debt limit the South Carolina Constitution imposes on a school district. We disagree.

An alter-ego theory requires a showing of total domination and control of one entity by another and inequitable consequences caused thereby. *Peoples Fed. Sav. & Loan Assoc. v. Myrtle Beach Golf & Yacht Club,* 310 S.C. 132, 148, 425 S.E.2d 764, 774 (Ct.App.1992). Control may be shown where the subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity. *Id.* However, this theory does not apply in the absence of fraud or misuse of control by the dominant entity which results in some injustice. *Id; see also Baker v. Equitable Leasing Corp.,* 275 S.C. 359, 367–68, 271 S.E.2d 596, 600 (1980) (holding that control, in and of itself, is not sufficient. It is necessary to show that the retention of separate corporate personalities would promote fraud, wrong or injustice, or would contravene public policy).

A grant of summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP; *Tupper v. Dorchester County,* 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997). Furthermore, when a motion for summary judgment is made and properly supported, an adverse party may not rest solely upon the allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), SCRCP.

To support their alter-ego cause of action, the Plaintiffs' amended complaint alleged that the School District or its agents would create the Corporation and select the Corporation's directors, and also that the Corporation would have "no purpose other than to do the will of the School District." In their motion for summary judgment, the Defendants relied in large part on the affidavit of the chairman of SCAGO's board of directors which directly refuted the Plaintiffs' allegations. Specifically, this affidavit established that SCAGO, not the School District, would form the Corporation, appoint the board of directors, approve the Corporation's by-laws, and oversee the Corporation's functions. The affidavit further established that SCAGO is a South Carolina non-profit corporation that was formed in 2002 and that the School District does not have control over SCAGO, nor does it have financial ties to SCAGO.

As the evidence illustrates, the affidavit offered by the Defendants in support of their motion for summary judgment directly refutes the allegations raised in the Plaintiffs' alter-ego claim. The Plaintiffs have not contested the substance of this affidavit, nor have they set forth any specific facts showing that there is a genuine issue for trial on this claim. Accordingly, there is no impediment to our deciding this claim on summary judgment.

Viewing the evidence in the light most favorable to the Plaintiffs, there is simply no support for the conclusion that the Corporation is the alter-ego of the School District. Our alter-ego jurisprudence instructs that the issues of domination and control over one entity by another are two touchstones of the relevant analysis. In the instant case, there is no evidence suggesting the existence of either of these conditions.

For this reason, we grant the Defendants' motion for summary judgment and hold that the Corporation is not the alter-ego of the School District.

In addition to an alter-ago claim, the Plaintiffs allege that the Corporation will be acting as the agent of the School District. Accordingly, the Plaintiffs' contend that the Corporation is bound by the School District's general obligation debt limit because an agent may possess no more authority than the principal. We disagree.

 "An agent is one appointed by a principal as his representative and to whom the principal confides the management of some business to be transacted in the principal's name, or on his account, and who brings about or effects legal relationships between the principal and third parties." *Thompson v. Ford Motor Co.*, 200 S.C. 393, 414, 21 S.E.2d 34, 43 (1942) (quoting *South Carolina v. W.T. Rawleigh Co.*, 172 S.C. 415, 174 S.E. 385 (1934)). Whether one person or entity is the agent of another is determined by examining whether the party alleged to be the principal has the right to control the conduct of the alleged agent. *Newell v. Trident Med. Cent.*, 359 S.C. 4, 12, 597 S.E.2d 776, 780 (2004).

In the instant case, the record contains no evidence indicating that the Corporation will be acting as the School District's agent in any capacity. As we have previously indicated, the evidence illustrates that SCAGO, not the School District, will form the Corporation, appoint the board of directors, approve the Corporation's by-laws, and oversee the Corporation's functions. Although the Corporation will raise money to fund the renovation of the School District's facilities, the Plaintiffs cite no authority supporting the proposition that this, in and of itself, creates an agency relationship. Similarly, the record does not contain any evidence indicating that the School District will have any right to control the Corporation's activities.

Although the Plaintiffs' argument may accurately summarize the law regarding whether an agent may legally perform acts which, if done by the principal, would be illegal, the Plaintiffs do not present any evidence which tends to establish that the Corporation will serve as the School District's agent in any fashion. Absent such a showing, this axiom of agency law has no framework in which to apply.

Accordingly, we grant the Defendants' motion for summary judgment and hold that the Corporation is not the agent of the School District.

## IV. Violations of District Procurement Code

The Plaintiffs allege that the resolution and its attendant agreements violate the School District's procurement code because (A) the agreements create contracts with financial

advisors, bond attorneys, a bond insurance company, and a company acting as a trustee, all without competitive bidding; (B) the agreements create contracts with SCAGO and the Corporation without competitive bidding; and (C) the contracts with SCAGO and the Corporation are improper multi-year contracts. We disagree.

### A. Agreements with financial advisors, bond attorneys, a bond insurance company, and a trustee

The School District's procurement code applies to the expenditure of "public funds irrespective of their source." *See* District Procurement Code § 1–102. Thus, generally speaking, the School District's procurement code would apply to contracts the School District enters into with financial advisors, bond attorneys, and other similar parties, provided that the contracts require the School District to spend public funds.

In the instant case, however, the resolution and its attendant agreements provide that the Corporation, not the School District, will enter into several of the challenged contracts with financial advisors, bond attorneys, a bond insurance company, and a company acting as a trustee. Unless the School District is a party to these contracts, we can discern no basis upon which to conclude that the School District's procurement code is applicable in these circumstances. Because the record indicates that the School District is not a party to these contracts, it naturally follows that the School District's procurement code, in these events, is inapplicable.

Second, § 2–101 of the School District's procurement code generally provides that all contracts awarded by the School District are to be awarded by competitive sealed bidding. This requirement is not absolute, however, and one exception to this procedure applies to contracts for professional services which are normally obtained on a fee basis. *See id.* at § 1–103(i) (listing attorneys, accountants, physicians, and dentists as examples of these types of services).

The School District argues that any contracts or agreements it has already formed or will form with bond attorneys or financial advisors will clearly fall under the procurement code's "professional services" exception. The Plaintiffs do not dispute this assertion, but instead argue that the School

District's "professional services" exception is invalid because the South Carolina General Assembly repealed a similar exception from the South Carolina Consolidated Procurement Code in June 2006.[10] We disagree with the Plaintiffs' contention.

■■■ This argument is unpersuasive. The General Assembly's repeal of the Consolidated Procurement Code's professional services exception has no relevance to the validity of the School District's identical exception. The Plaintiffs do not argue that Act No. 376 directly repealed the School District's exception, nor do they suggest that the act implicitly repealed the School District's exception. Instead, the Plaintiffs suggest that Act No. 376 amounts to a determination that a professional services exception no longer embodies "sound principles of appropriately competitive procurement" within the meaning of S.C.Code Ann. § 11–35–50 (Supp.2005).

We hold that this conclusory statement is insufficient to present any issue to this Court for review. The Plaintiffs' brief presents only this blanket conclusion and provides no authority supporting their argument. Thus, the Plaintiffs have effectively waived this argument. *See Solomon v. City Realty Co.*, 262 S.C. 198, 201, 203 S.E.2d 435, 436 (1974) (an exception was deemed effectively abandoned where the argument relating to the exception consisted solely of an inaccurate "bald conclusion").

Accordingly, we hold that the School District did not violate its procurement code by entering into contracts with financial advisors or bond attorneys. Furthermore, we hold that the School District's procurement code is irrelevant to contracts the Corporation may enter into with financial advisors, bond attorneys, a bond insurance company, or a company acting as a trustee.

### B. Agreements with SCAGO and the Corporation

The Plaintiffs claim that the resolution and its attendant agreements improperly create contracts with SCAGO and the

---

**10.** S.C.Code Ann. § 11–35–1270 (Supp.2005) is substantially similar to the School District's "professional services" exception. The General Assembly repealed this entire section during its 2006 session. *See* Section 63, Act No. 376, 2006 S.C. Acts 2839, 2894.

Corporation without complying with the competitive bidding requirement in the School District's procurement code. We disagree.

As our jurisprudence instructs, an issue that is contingent, hypothetical, or abstract is not ripe for judicial review. *Waters*, 321 S.C. at 227, 467 S.E.2d at 917–18. Stated differently, "[a] justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." *Id.* (quoting *Pee Dee Elec. Co–Op, Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983)).

The Plaintiffs' claims on this issue can be grouped into challenges to three arrangements: (1) the arrangement under which the School District is to convey the existing school facilities to the Corporation and lease the land on which these facilities sit to the Corporation; (2) the arrangement under which the School District may purchase the renovated or newly constructed facilities by making annual installment payments to the Corporation; and (3) the construction contracts the School District may enter on behalf of the Corporation.[11]

As a first matter, neither conveying the existing facilities nor leasing the Corporation the land on which these facilities sit involves the expenditure of public funds. Therefore, the procurement code does not apply to these agreements.

Second, an adjudication of the Plaintiffs' claims on the remaining agreements at the present time presumes too much. As yet, no public funds have been appropriated as installment payments under the "Installment Purchase and Use Agreement." Thus, this challenge can only be deemed an academic and premature exercise. Furthermore, the Plaintiffs' remaining claim assumes that the School District will award the renovation and construction contracts in a manner other than

---

11. The Plaintiffs also challenge the School District's agreement with SCAGO. However, because neither the resolution nor any attendant agreement provides for the School District to pay SCAGO any money, there seems to be no basis upon which we can conclude that the procurement code would apply to such an agreement.

by competitive sealed bidding. Because this claim involves pure hypothesis and speculation, this claim is not ripe for judicial review. Assuming the Plaintiffs meet the required elements of standing, the proper time to bring this claim would be after the School District awarded a construction contract to a contractor without using the sealed competitive bid process.[12]

Accordingly, we dismiss the Plaintiffs' claims that the agreements improperly create contracts with SCAGO and the Corporation without competitive bidding. Most ·of these claims fail on their merits, and those remaining are not ripe for review.

### C. Multi-year Contracts

The Plaintiffs argue that the "Installment Purchase and Use Agreement" (providing for the buy-back of renovated or newly constructed school facilities) and the "Base Lease and Conveyance Agreement" (leasing the land on which the renovated school facilities currently sit to the Corporation) violate the procurement code's limit on the term of contracts. We disagree.

Section 2–302 of the School District's procurement code generally provides that the School District may not enter into a contract for "supplies" or "services" which contains a term agreement extending beyond five years. The procurement code's definitional section defines "service" as "the furnishing of labor, time, or effort." See id. § 1–201(22). The section defines "supplies" as "[a]ll property including ... leases of real property, excluding land or a permanent interest in land." Id.

Because the procurement code's plain terms clearly exclude "land or a permanent interest in land" from the definitional provisions which are subject to the code's limitations on the terms of contracts, concluding that the "Base Lease and Conveyance Agreement" is excluded from the procurement code's time limit is a rather elementary determination.

---

12. Furthermore, we think it might be argued that these construction contracts do not involve spending public funds. Of course, the parties have not presented these arguments, presumably because none of these contracts currently exist.

Turning to the "Installment Purchase and Use Agreement," we hold that this contract is also exempt from the procurement code's time limitation, but for a different reason. The agreement expressly provides that it is not an agreement for a multi-year term, but is instead a one-year agreement that may, at the School District's option, be renewed until the School District has completely purchased the renovated and newly constructed school facilities from the Corporation. Because this agreement is not for a multi-year term, the procurement code's time limitation on contracts does not apply.

Accordingly, we hold that the School District has not violated the time limit on contracts found in its procurement code.

## V. Illegal Bond Offering

The Plaintiffs allege that the School District did not have a "valid public purpose" for its September issuance of general obligation bonds because the School District issued these bonds to raise cash for its first installment payment under the resolution. We disagree.

Our determination that the resolution and its attendant agreements are in conformance with the relevant constitutional and statutory provisions effectively forecloses this claim. Accordingly, we deny the Plaintiffs' request to issue a declaratory judgment that the School District's September issuance of general obligation bonds was illegal, invalid, or *ultra vires.*

### Conclusion

For the foregoing reasons, we hold that the resolution and its attendant agreements do not constitute "financing agreements" as defined by the provisions of § 11–27–110(A)(6) which are currently in effect. We therefore determine that the School District has not exceeded its constitutional and statutory debt limit. We further hold that the School District has committed no violations of its procurement code, and we find in favor of the School District on the remaining causes of action.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.