699 S.E.2d 189

William R. CREWS, Employee, Claimant, Respondent,

v.

W.R. CREWS, INC. & Architectural Railings And Grilles, Employers, and Liberty Mutual Insurance Corp., and The Hartford, Carriers, and South Carolina Workers' Compensation Uninsured Employers' Fund, Defendants,

of whom W.R. Crews, Inc. & Architectural Railings and Grilles, Employers, The Hartford, Carriers, and South Carolina Workers' Compensation Uninsured Employers' Fund are Respondents,

and

Liberty Mutual Insurance Corp. is the Appellant.

No. 4735.

Court of Appeals of South Carolina.

Heard Feb. 2, 2010.

Decided Sept. 1, 2010.

16

Allison Molony Carter, of Charleston, for Appellant.

A.G. Solomons, Jr., of Estill, John E. Parker, of Hampton, Latonya Dilligard Edwards and Matthew C. Robertson, both of Columbia, Stephen L. Brown, Francis Drake Roger, and Russell G. Hines, all of Charleston, for Respondents.

THOMAS, J.

In this workers' compensation case, the circuit court held Liberty Mutual Insurance Corporation's cancellation of W.R. Crews, Inc.'s policy was invalid and remanded the matter to the commission to order Liberty Mutual to begin paying benefits and providing treatment to the claimant, William R. Crews.[1] Liberty Mutual appeals. We affirm.

## FACTS AND PROCEDURAL HISTORY

Crews was in the business of installing handrails and performed installation work for Architectural Railings and Grilles (ARG). Initially, he operated as a sole proprietorship and was insured under ARG's workers' compensation policy. Later, ARG notified him that he would have to obtain his own workers' compensation coverage. As a result, Crews incorporated his business in 2003 and contacted independent insurance agent Tim Loadholt of the Loadholt Agency to obtain workers' compensation coverage.

Loadholt procured workers' compensation insurance for Crews through the Assigned Risk Pool by submitting an application to the National Council on Compensation Insur-

---

1. For purposes of this appeal, the interests of W.R. Crews, Inc., and William R. Crews are essentially the same; therefore, the name "Crews" will refer interchangeably to either party or to both parties collectively.

ance (NCCI).[2] Crews obtained financing from a premium financing company to pay for coverage. The premium financing company paid the premiums in advance for the entire year and then received installment payments from Crews. Crews' coverage was assigned to Liberty Mutual.

Liberty Mutual issued the policy using estimated payroll information provided by Crews and Loadholt to compute the premiums. Because neither Crews nor Liberty Mutual would know the exact payroll exposure until the end of the policy term, the premiums were estimates until the completion of an actual audit. In order to complete the audit, Liberty Mutual needed actual payroll and tax documentation to verify the exposure. The central issue in this appeal is Crews' alleged noncompliance with Liberty Mutual's audit requests.

On September 22, 2003, Liberty Mutual issued Crews a policy covering the period beginning August 8, 2003, and ending August 8, 2004. This policy will be identified here as the "013 Policy."[3] On May 11, 2004, Liberty Mutual sent Crews and Loadholt a renewal quote for the policy period beginning August 8, 2004, and ending August 8, 2005. The renewal quote related to a policy that would have been assigned a different number had it been issued. That policy will be referred to as the "014 Policy."

On August 2, 2004, towards the end of the term of the 013 Policy, Liberty Mutual sent Crews a mail form audit request in order to determine whether Crews owed additional premium payments on this policy or was entitled to a refund of estimated premiums he had already paid. If the audit showed the actual premium should have been higher than what was originally estimated, Crews' coverage was still effective during

---

**2.** An "assigned risk pool" is a group of servicing carriers who enter into an assigned risk agreement "with respect to the equitable apportionment among them of insurance which may be afforded to applicants who are in good faith entitled to, but who are unable to procure, insurance through ordinary methods." S.C.Code Ann. § 38–73–540(A)(1) (2002). In 2000, the NCCI filed the South Carolina Workers Compensation Assigned Risk Plan with the South Carolina Department of Insurance, which has adopted and followed the Plan. *Rodriguez v. Romero*, 363 S.C. 80, 85, 610 S.E.2d 488, 490 (2005).

**3.** The policies discussed are identified by the last three digits of the corresponding policy numbers.

the policy period; however, Liberty Mutual would be entitled to an additional payment to cover the increased exposure.

The quoted premium for the 014 Policy was due before coverage on that policy was scheduled to begin. Because Crews did not timely pay the premium, Liberty Mutual did not issue the policy and voided the renewal quote. Crews paid the quoted amount three days later. As a result, Liberty Mutual issued a third policy covering the period from August 11, 2004, through August 11, 2005. Like the 013 Policy, this policy, which was assigned a different number and will be referred to as the "024 Policy," was financed so that the whole year's premium was paid in advance.

Liberty Mutual did not receive a response to the mail form audit request it sent Crews on August 2, 2004, and sent another request on August 30, 2004. Because Liberty Mutual received no response to the follow-up request, on October 14, 2004, it issued an estimated audit to Crews indicating neither party owed money to the other but this determination was subject to revision once Crews sent the requested information with proper tax documentation. On the same day, Liberty Mutual sent Crews a separate letter, advising that the 024 Policy "has been canceled" effective November 18, 2004. The letter further stated the reason for the cancellation was "non-compliance with plan rules," explaining Crews failed to comply with auditing or loss prevention service department requests. The letter further advised in block letters the policy would not be reinstated and suggested Crews submit another application to NCCI for workers' compensation coverage. In a deposition, Cindy Thiel, a senior customer account representative with Liberty Mutual Involuntary Market Operations, further clarified that the auditing request with which Crews allegedly failed to comply concerned the 013 Policy.

In response to a telephone call from Crews, Liberty sent an additional mail form audit report to him on October 22, 2004. This mailing was documented in a timeline prepared by Thiel. According to the timeline, this form was for the 013 Policy. The Loadholt Agency faxed the completed audit form to Liberty Mutual on November 12, 2004; however, no supporting tax documentation was included.

On November 19, 2004,[4] Liberty Mutual sent a letter to Crews requesting tax documentation. Contrary to Liberty Mutual's assertion on appeal that the purpose of the request was to do a final premium calculation for the 024 Policy, the letter contained the following warning: "If the proper documentation is not sent along with your mail audit your current policy *may* be canceled for non-compliance with audit." (Emphasis added.)

The Loadholt Agency alleged it faxed the requested documents to Liberty Mutual on December 21, 2004; however, Liberty Mutual denied receiving the documents and the only fax verification report in the record pertaining to that time indicated that the transmission had failed. Moreover, Thiel testified that on December 8, 2004, Liberty Mutual sent another follow-up request on the 024 Policy and, on December 23, 2004, issued "the final warning letter for the 024 term." On January 25, 2005, Liberty Mutual sent Crews an estimated audit on the 024 Policy in which it advised that the policy was cancelled on November 18, 2004, and that neither party owed anything to the other. The correspondence further advised that the calculations were subject to revision when Crews submitted a report of actual amounts and proper tax documentation. On November 17, 2004, the NCCI received a notice that the 024 Policy had been cancelled on October 21, 2004, and under applicable regulations, it would have considered coverage cancelled thirty days after that date.[5]

Crews suffered a serious workplace injury on February 2, 2005. Liberty Mutual acknowledged receiving a fax containing the tax documents on the same day. By letter dated February 4, 2005, however, Liberty Mutual advised Crews it was denying his claim for benefits because his workers' compensation policy had been cancelled effective November 18, 2004. On February 14, 2005, Liberty Mutual issued a revised audit bill, showing that based on the documents he submitted

---

4. As noted earlier, Liberty Mutual had already advised Crews in its October 14, 2004 correspondence it intended to cancel his 024 Policy effective November 18, 2004.

5. *See* S.C.Code Ann. Regs. 67–406(F)(2) (1990) ("Insurance expiration, termination or cancellation shall not be effective until after thirty days from the date of receipt by NCCI of the NCCI [Policy Termination/Cancellation/Reinstatement Notice]").

the day of his accident, Crews owed an additional $1,347 on the 013 Policy and would receive an invoice for this amount under separate cover.

Crews filed a Form 50 on December 20, 2005. The single commissioner heard the matter on July 27, 2006, and by order dated April 10, 2007, upheld Liberty Mutual's cancellation of the 024 Policy for "[Crews'] lack of substantial compliance with reasonable audit requirements for the 013 policy." In addition, the single commissioner found although ARG was Crews' statutory employer, it had relied in good faith on what it believed to be a valid Certificate of Insurance and, based on this finding, allowed its carrier to transfer liability to the Uninsured Employers' Fund (the Fund).

In a divided decision, the appellate panel affirmed the single commissioner.[6] Pursuant to a petition for judicial review filed by Crews, the circuit court issued an order on May 8, 2008, reversing the appellate panel's order and remanding the matter to the commission with instructions to find that Liberty Mutual was responsible for paying Crews' workers' compensation benefits. The court further determined Liberty Mutual's cancellation of the 024 Policy was invalid based on the following findings: (1) none of the circumstances under which the assigned risk plan allows cancellation of a policy was present in this case, (2) Crews complied to the best of his ability with Liberty's Mutual's audit procedures, and (3) any breach by Crews affected only the 013 Policy and not the 024 Policy. This appeal followed.

## ISSUES

I. Did the circuit court err in holding Liberty Mutual could not cancel the 024 Policy based on Crews' alleged noncompliance with an audit request on the 013 Policy?

II. Did the circuit court err in finding Crews substantially complied with Liberty Mutual's audit requirements?

III. Did the circuit court err in failing to uphold the appellate panel's findings that Liberty Mutual provided Crews

---

6. One member of the appellate panel stated she would reverse the transfer of liability to the Fund on the ground that ARG's carrier should pay in the first instance before liability could be transferred.

sufficient notice that the policy was to be cancelled and reason for cancellation of the policy?

IV. Was the purported cancellation ineffective because of Liberty Mutual's alleged failure to return any unearned premium to Crews?

V. Should Liberty Mutual be estopped from denying coverage?

VI. Should ARG be allowed to transfer liability to the Fund?

## STANDARD OF REVIEW

In an appeal from the workers' compensation commission, "neither this Court nor the circuit court may substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact, but it may reverse when the decision is affected by an error of law." *Hopper v. Terry Hunt Constr.*, 373 S.C. 475, 479, 646 S.E.2d 162, 164 (Ct.App. 2007), *aff'd*, 383 S.C. 310, 680 S.E.2d 1 (2009); *see also Grant v. Grant Textiles*, 372 S.C. 196, 201, 641 S.E.2d 869, 871 (2007) (stating appellate review of a workers' compensation decision "is limited to deciding whether the commission's decision is unsupported by substantial evidence or is controlled by some error of law").

## LAW/ANALYSIS

### I. Cancellation of the 024 Policy

Liberty Mutual argues the appellate panel correctly found it properly cancelled the 024 Policy, noting that the policy expressly advised as follows: "If requested information is not made available in a timely fashion, your premium will be estimated and your policy may be canceled." It further cites provisions in the policy under which insureds are required to "keep records of information needed to compute premium" and "will provide us with copies of those records when we ask for them." Liberty Mutual points to a provision in the Assigned Risk Plan under which an employer's failure to comply with reasonable audit requirements is a ground for cancellation of a workers' compensation policy. Finally, Liberty Mutual contends the circuit court improperly decided the matter as a question of law when it should have focused on

whether substantial evidence supported the appellate panel's finding that cancellation was proper. We disagree.

As the circuit court noted, both Loadholt and Thiel testified that Crews was in full compliance with the policy requirements of the 024 Policy. Although Thiel asserted the plan rules in the NCCI manual required Liberty Mutual to cancel any current policy due to noncompliance with an audit request for a prior policy, we found no rules with this precise language in the record. Moreover, as the circuit court noted: "There is no provision of the Plan requiring or allowing cancellation of a current policy due to an alleged failure to comply with the requirements of a *previous* policy, Policy 013 in this case." We believe the circuit court's interpretation of the Assigned Risk Plan is correct as a matter of law, and based on this interpretation, the court's reversal of the appellate panel's order was proper.

The Assigned Risk Plan specifies five circumstances allowing a carrier to cancel an insurance policy: (1) the employer is not in good faith entitled to workers' compensation coverage, (2) the employer has failed to comply with reasonable health, safety, or audit and loss prevention requirements, (3) the employer has violated one or more of the terms under which the insurance was issued, (4) the employer refuses to allow the assigned carrier reasonable access to its facilities or its files and records for audit or inspection, and (5) the employer refuses to disclose to the assigned carrier the full nature and scope of the assigned carrier's exposure. The only circumstance applicable here was Crews' alleged failure to comply with reasonable audit requirements. We hold that under the terms of both the 024 Policy and the Assigned Risk Plan, Crews' alleged noncompliance with an audit request for the 013 Policy does not constitute a failure to comply with a "reasonable" audit request for the 024 Policy.

As to audit requirements, the Plan requires carriers "to complete a final audit and to bill for any additional premium or refund any excess premium paid during the policy year." The wording of this provision indicates that settlement of any discrepancies between the amount paid by an insured for the policy period and the amount owing for the corresponding term is to be handled directly between the carrier and the

insured, without adjustments to any subsequent policies between them. That is exactly what happened here; once Liberty Mutual completed the final audit on the 013 Policy, it advised Crews it would be sending him an invoice for the surcharge.

Furthermore, contrary to Liberty Mutual's contention that "NCCI rules speak to coverage under the plan and do not differentiate between separate policies," the payroll audit provision of the plan provides that "[f]ailure by the employer to allow a preliminary or final audit will result in the cancellation of *the policy* for noncompliance with policy terms and conditions." Here, the audit pertained to the 013 Policy; thus, any noncompliance on Crews' part would affect only his coverage under that policy.

As support for its position, Liberty Mutual cites *Budget Premium Co. v. American Casualty Co.*, 136 Ill.App.3d 682, 91 Ill.Dec. 107, 483 N.E.2d 389, 391 (1985), for the proposition that "[s]uccessive policies issued by the same insurer to the same insured, for the same or similar coverage are considered renewal policies." The quoted passage, however, is from a section of the Illinois Code. We have not found, nor has Liberty Mutual directed to our attention, any analogous statute in the South Carolina Code. Moreover, case law from our jurisdiction suggests otherwise. *See Webb v. S.C. Ins. Co.*, 305 S.C. 211, 213, 407 S.E.2d 635, 636 (1991) (holding a policy renewal is a new contract "unless (1) the expiring policy mandates the same terms shall remain in effect *and* (2) the terms of the policy do not change upon renewal"). In the present case, Thiel herself admitted Crews was in compliance with the terms of the 024 Policy when it was cancelled by Liberty Mutual and agreed the 024 Policy was a separate policy from the 013 Policy. We therefore agree with the circuit court that Crews' alleged noncompliance with an audit request to determine what he owed on the 013 Policy was not a valid reason for Liberty Mutual to cancel the 024 Policy.

## II. Substantial Compliance

As an additional ground for reversing the appellate panel's decision, the circuit court noted Crews had complied to the best of his ability with Liberty Mutual's audit request. In

response, Liberty Mutual contends Crews' compliance efforts were insufficient because of provisions in the Assigned Risk Plan that purportedly prohibit reinstatement of coverage if an item correcting a deficiency is received more than sixty days from the date of cancellation. Based on this argument, Liberty Mutual asserts its receipt of the tax documentation the same day Crews was injured did not warrant reinstatement of his coverage. We disagree with Liberty Mutual's position that Crews' compliance efforts were insufficient.

The South Carolina Supreme Court has recognized that although none of the provisions of the Assigned Risk Plan have been promulgated as regulations, the Plan "has the force of law" because it has been approved by the Director of the Department of Insurance. *Avant v. Willowglen Acad.*, 367 S.C. 315, 318–19, 626 S.E.2d 797, 799 (2006). Furthermore, because the focus of the Plan is on assigned risk insurance, its provisions prevail over workers' compensation regulations, which address workers' compensation generally. *Id.*

The Assigned Risk Plan allows a carrier to initiate cancellation procedures if it determines one of the five conditions enumerated above exists; however, Plan rules specify the carrier must first provide an opportunity to cure. Furthermore, the Plan requires a servicing carrier "[t]o work with and assist the ... employer ... on problems relating to coverage and service under the Plan." It follows that a carrier is to adopt a flexible approach when dealing with an insured who is unable to strictly comply with the policy terms but is making reasonable efforts to do so.

To determine whether Crews substantially complied with the audit request, the critical time period is the interval between August 2, 2004, when Liberty Mutual issued its initial mail form audit request for the 013 Policy, and November 18, 2004, the date the 024 Policy was scheduled to be cancelled. During that interval, Crews had not yet filed his 2003 tax returns for his business; therefore, he was unable to send the tax documentation that Liberty Mutual requested. Nevertheless, he completed and returned the audit form several days before the scheduled cancellation. Only after Liberty Mutual cancelled the 024 Policy did it notify him additional documents were necessary. Because Liberty Mutual had time to notify

Crews before the scheduled cancellation that he needed to provide additional information but failed to give such notice until after it cancelled the 024 Policy, we agree with the circuit court that Liberty Mutual did not act reasonably in providing an opportunity for cure, as it was required to do under the terms of the Assigned Risk Plan. Furthermore, as the circuit court noted, Liberty Mutual advised Loadholt the cancellation would stand even if the fax transmission of the tax documents had been successful. This finding is consistent with Liberty Mutual's position that its reason for sending a request on November 19, 2004, for tax documentation was for a final audit of the now-cancelled 024 Policy rather than for purposes of reinstating it.[7]

### III. Notice of Cancellation

█ Liberty Mutual next argues the record has substantial evidence supporting the appellate panel's finding that it gave the statutorily required notice to Crews. Assuming without deciding that this argument is correct, we hold it is not a reason to reverse the circuit court's decision.

Under section 38–75–730(c) of the South Carolina Code (2002 & Supp.2009), an insurer may cancel a policy "for any reason by furnishing to the insured at least thirty days' written notice of cancellation, except where the reason for cancellation is nonpayment of premium, in which case not less than ten days' written notice must be furnished." This provision, however, must be read in conjunction with the portions of the Assigned Risk Plan concerning when and how an assigned risk carrier may cancel a policy. We have already concluded (1) the circuit court correctly ruled Liberty Mutual could not cancel Crews' current policy because of his alleged noncompliance with audit requests for his former policy and (2) in the alternative, Liberty Mutual did not comply with Plan require-

---

7. Moreover, if in fact Liberty Mutual's only reason for its November 19, 2004 correspondence was to gather information for a final audit of the 024 Policy rather than to give Crews another chance to remedy the deficiency in the information so that his coverage could be reinstated, Liberty Mutual arguably would have violated the Assigned Risk Plan. Under the Plan provisions, "[i]f an item correcting a fault which resulted in cancellation is *received* on or within sixty (60) days after the effective date of cancellation, the carrier *shall* reinstate insurance with a lapse in coverage...." (Second emphasis added.)

ments that it provide Crews an opportunity to cure the deficiencies in the information he sent at its request. It follows, then, that because Liberty Mutual's cancellation of Crews' insurance policy was not permitted under the Assigned Risk Plan, its compliance with statutory notice requirements about the cancellation is of no effect.

## IV.  Failure to Return Unearned Premiums

Liberty Mutual next argues the circuit court should have upheld the finding by the single commissioner and the appellate panel that its failure to return unearned premiums to Crews did not render its cancellation of Crews' workers' compensation policy ineffective. The issue of whether Liberty Mutual should have returned unearned premiums to Crews to effect cancellation of his insurance policy does not affect our prior determination that Liberty Mutual could not cancel the 024 Policy because of Crews' failure to provide information for the 013 Policy. Likewise, the issue of unearned premiums would have no impact on our ruling that Crews was entitled to an opportunity to cure any deficiencies in his response to the audit requests before his policy could be cancelled. Because these two reasons are sufficient to uphold the circuit court's decision to reverse the appellate panel's order, we decline to address the arguments concerning the obligation of an insurer under the Assigned Risk Plan to return unearned premiums to an insured following the cancellation of a policy. *See Weeks v. McMillan*, 291 S.C. 287, 292, 353 S.E.2d 289, 292 (Ct.App. 1987) ("Where a decision is based on alternative grounds, either of which independent of the other is sufficient to support it, the decision will not be reversed even if one of the grounds is erroneous.").

## V.  Estoppel

Liberty Mutual further argues it should not be estopped from denying coverage. In the appealed order, the circuit court noted that estoppel was one of the questions presented in Crews' petition for judicial review; however, based on the court's decision that Liberty Mutual's cancellation of the 024 Policy was invalid for other reasons, it declined to rule on this issue. We likewise hold it is unnecessary in this appeal to address the question of whether the doctrine of estoppel

should prevent Liberty Mutual from denying coverage for Crews' injury. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when a decision on a prior issue is dispositive).

## VI. Transfer of Liability from ARG to the Fund

Finally, the Fund contends that, in the event this court holds in favor of Liberty Mutual, we should reverse the appellate panel's decision to allow ARG to transfer its own liability to the Fund. Because we have upheld the circuit court's decision that Liberty Mutual's cancellation of the policy was invalid, we need not address this argument. *See Colleton County Taxpayers Ass'n v. Sch. Dist. Of Colleton County*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006) ("[A]n issue that is contingent, hypothetical, or abstract is not ripe for judicial review."); *Hitter v. McLeod*, 274 S.C. 616, 619, 266 S.E.2d 418, 420 (1980) (declining to rule on an issue that was not ripe for adjudication and noting it "presents [the court] with nothing more than a vehicle for rendering an advisory opinion").

## CONCLUSION

We affirm the circuit court's ruling Liberty Mutual is the liable party for workers' compensation benefits in this case; however, our holding is based solely on our determinations that Liberty Mutual could not cancel Crews' current policy because of auditing difficulties with his prior policy and that Liberty Mutual could not cancel either policy without giving Crews a reasonable opportunity to cure any alleged noncompliance. Because neither ARG nor the Fund would be responsible for paying workers' compensation benefits in this case, we decline to address the Fund's argument that it should not have been required to assume liability in the first instance.

**AFFIRMED.**

HUFF and KONDUROS, JJ., concur.