577 S.E.2d 202

**Allen Lee HAWKINS and Gryphon Inc., Respondents,**

**v.**

**BRUNO YACHT SALES, INC., Beaufort County, a Political Subdivision of the State of South Carolina, and Joy Logan in the capacity of Treasurer for Beaufort County, South Carolina, Petitioners.**

No. 25592.

Supreme Court of South Carolina.

Heard Nov. 20, 2002.

Decided Feb. 3, 2003.

32

John Hughes Cooper, of John Hughes Cooper, P.C., of Sullivan's Island; Stephen P. Groves, Sr. and Stephen L. Brown, of Young, Clement, Rivers & Tisdale, L.L.P., of Charleston; Stephen P. Hughes and Mary B. Lohr, of Howell, Gibson & Hughes, P.A., of Beaufort; all for Petitioners.

Julius H. Hines, of Buist, Moore, Smythe & McGee, P.A., of Charleston, for Respondents.

Chief Justice TOAL:

This is an action by Respondents, Allen Lee Hawkins ("Hawkins") and Gryphon, Inc. ("Gryphon"), to set aside the delinquent tax sale of Hawkins's sailboat, the "LadyHawk", to Petitioner, Bruno Yacht Sales ("BYS").

### FACTUAL/PROCEDURAL BACKGROUND

In December 1986, Hawkins purchased a 52–foot sailboat made by Tayana, a Tawainese company. Hawkins named the boat the LadyHawk, and registered it as a United States vessel with the Coast Guard. In total, Hawkins spent just over $300,000 to purchase the hull and to have the boat fully outfitted.

In December 1989, Hawkins sold the LadyHawk to Gryphon, a close corporation of which Hawkins was the sole shareholder, for ten dollars. In 1992, Gryphon transferred

the LadyHawk back to Hawkins.[1]  At the time of this sale, the address of both Hawkins and Gryphon was listed as "50 Palmetto Bay Road, Box 200, Hilton Head, South Carolina, 29928."

In 1994, Beaufort County assessed personal property taxes of $2,417.10 on the LadyHawk, and sent a tax bill to Hawkins for that amount at the Palmetto Bay address.  Hawkins failed to pay the taxes and was assessed a penalty of $397.57 in addition to the taxes.  Hawkins failed to pay either the taxes or the penalty by March 1995.  As a result, the Beaufort County Treasurer issued a tax execution on March 17, 1995.

The Deputy Treasurer for Beaufort County ("County"), Herschel Evans ("Evans"), testified that, according to the County's normal procedure, the first notice of delinquent taxes would have been mailed on April 1, 1995, and that the second delinquent notice, a levy by distress, would have been mailed on May 1, 1995, by certified mail.  Hawkins testified that he did not receive either of these notices, and there was no documentation to confirm these notices were actually mailed.[2]

In August 1995, the County Treasurer sent Hawkins two notices of delinquent taxes by certified mail, postmarked August 16, 1995, and August 24, 1995, respectively.  The Treasurer's file does contain sender's receipts and signed receipt cards for these mailings.  Delivery was not restricted to Hawkins, and he did not sign for them, but he did receive them in Florida by forwarded mail at the end of August.[3] Upon receipt of these notices in August, Hawkins retained a Beaufort attorney to contest his liability for the taxes.  To

---

1.  Initially, the Coast Guard refused to record the bill of sale from Gryphon, Inc. back to Hawkins because it was not notarized.  A new bill of sale was prepared and notarized, but the box for the seller's signature was left blank in the second bill of sale.  The Coast Guard recorded it notwithstanding this mistake, and a June 1992 Coast Guard document lists Hawkins as the record owner.

2.  Hawkins testified he sailed the LadyHawk from South Carolina to Florida in May 1995, but that he checked his mail at the Palmetto Bay address before he left.

3.  Hawkins testified that the Palmetto Road box belonged to his wife, and that she mailed him a packet of mail at the end of August that contained the two tax notices.

that end, his attorney sent a letter to the County Treasurer stating that the LadyHawk had not ever been in South Carolina for more than six months, and that Hawkins was not a South Carolina resident. Hawkins did not receive a response to the letter, and did not make any effort to pay the delinquent taxes.

On September 22, 1995, the Treasurer advertised Hawkins's boat for sale in the Beaufort Gazette. The advertisement listed Hawkins's name and his tax account number, PP550HA-WALL, and the sum of taxes due, $2,814.67. A heading at the top of the advertisement indicated that account numbers beginning in "PP" related to boats.

Bruno Yacht Sales ("BYS") was the sole bidder at the October 2, 1995, tax sale. It purchased the LadyHawk for $2,814.67. In December 1995, several deputies forced Hawkins off his boat in Florida and turned possession over to BYS.

On December 19, 1995, Hawkins brought a "petitory" admiralty claim in the United States District Court for the Southern District of Florida, to arrest the LadyHawk and clear its title. Hawkins's counsel argued among other things that the tax sale should have proceeded against Gryphon as the true owner of the LadyHawk, based on the fact that the 1992 bill of sale from Gryphon to Hawkins was invalid, as the seller (Gryphon—owned solely by Hawkins) had not signed it. The District Court found it lacked jurisdiction because Hawkins was neither the current owner nor the real party in interest, and found further that it was not the proper forum to determine the validity of South Carolina taxation decisions. The District Court dismissed the action without prejudice, and noted that its dismissal' was not an adjudication of title.

Hawkins brought the instant action in August 1996 to set aside the sale of the LadyHawk and to restrain BYS from selling the LadyHawk. The Master upheld the tax sale of the LadyHawk.[4] The Court of Appeals reversed and remanded, finding the tax sale of the LadyHawk void. *Hawkins v. Bruno Yacht Sales, Inc.*, 342 S.C. 352, 536 S.E.2d 698 (Ct.App. 2000). Petitioners raise the following issues on appeal:

---

4. While the case was pending before the Master–in–Equity, BYS sold the LadyHawk (now named "Mystic") to a third party for $150,000.

I.   Did the Court of Appeals err in finding the tax sale of the LadyHawk void pursuant to S.C.Code Ann. § 12–51–40 (Supp.1994) because of defects in the levy notice, in the mailing of the notice, or in the description of the LadyHawk in the advertisement?

II.  Did the Court of Appeals err in failing to hold that Hawkins was judicially estopped from asserting ownership of the LadyHawk based on his argument to the contrary before the Florida District Court?

## LAW/ANALYSIS

### I.   Tax Sale

Petitioners argue that the Court of Appeals erred in finding the tax sale of the LadyHawk void under S.C.Code Ann. § 12–51–40 (Supp.1994). The Court of Appeals found the following three errors in the tax sale: (1) the levy notice included an artificial deadline for payment; (2) the notices should have been mailed restricted delivery; and (3) the LadyHawk was not described sufficiently in the published tax sale advertisement.

### A.   Artificial Deadline

■■■■ South Carolina Code Ann. § 12–51–40 controls the procedure for notifying delinquent taxpayers that property will be sold in order to collect delinquent taxes. This Court has held that "[t]ax sales must be conducted in strict compliance with statutory requirements." *Ryan Inv. Co. v. Richland County,* 335 S.C. 392, 394, 517 S.E.2d 692, 693 (1999) (citing *Dibble v. Bryant,* 274 S.C. 481, 265 S.E.2d 673 (1980)). Further, the fact that the defaulting taxpayer has actual notice of the impending tax sale "is *insufficient* to uphold a tax sale absent strict compliance with statutory requirements." *Ryan,* 335 S.C. at 394, 517 S.E.2d at 693 (emphasis added).[5] Finally, failure to give the required notice of a tax sale is a fundamental defect in the tax sale proceedings that renders the proceedings absolutely void. *Rives v. Bulsa,* 325 S.C. 287, 478 S.E.2d 878 (Ct.App.1996).

---

5.   The Court granted a motion by BYS to argue against this precedent in favor of a rule that actual notice of delinquent taxes and impending sale is sufficient.

South Carolina Code Ann. § 12–51–40(a) requires the county treasurer to mail a notice as close to April 1st as possible, specifying that "if the taxes, penalties, assessments, and costs are not paid, the property must be advertised and sold to satisfy the delinquency." If the taxes remain unpaid thirty days after the mailing of the April 1 notice, the treasurer is entitled to "take exclusive possession of as much of the defaulting taxpayer's property as is necessary to satisfy the payment of taxes, assessments, penalties, and costs." S.C.Code Ann. § 12–51–40(b). For personal property, this section provides that exclusive possession is taken by mailing the notice of delinquent taxes to the address shown on the tax receipt. The statute mandates that

> all delinquent notices shall specify that if the taxes, assessments, penalties, and costs are not paid *on or before a subsequent sales date,* the property must be duly advertised and sold for delinquent property taxes, assessments, penalties, and costs.

S.C.Code Ann. § 12–51–40(b) (emphasis added).

The first notice received by Hawkins in August showed the amount due and was stamped with the following statement:

> IF NOT PAID ON OR BEFORE 31 AUGUST THIS PROPERTY WILL BE DULY ADVERTISED AND SOLD FOR DELINQUENT TAXES AS DESCRIBED ABOVE ON THE FIRST MONDAY IN OCTOBER THIS YEAR. RETURN OF THIS "CERTIFIED RECEIPT" SHALL BE DEEMED EQUIVALENT TO "LEVYING BY DISTRESS."

The second notice, dated August 24, was accompanied by a letter from the County Treasurer, Joy Logan. The letter reiterated that the taxes were delinquent, and that the property was subject to sale at the October 2, 1995, tax sale, but stated "[a]ll tax payments must be received by September 15, 1995 to avoid your name and property being advertised in The Beaufort Gazette and The Island Packet."

The Court of Appeals held that these two notices created artificial deadlines for payment before the sales date, and thereby contradicted the statutory language requiring that the notice inform the delinquent taxpayer that the taxes must be paid "before a subsequent sales date." Because the sales date

in this instance was October 2, the Court of Appeals found that the August 31 and September 15 deadlines were artificial, and gave the impression that Hawkins had to pay the taxes weeks before the date of sale. We agree with the Court of Appeals' holding on this issue.

The County argues that this reading of section 12–51–40(b) conflicts with the advertising requirements of section 12–51–40(d). We disagree. Section 12–51–40(d) explains how the property must be advertised before auction, and requires that the advertising be published once a week for two consecutive weeks prior to the sale. The County's argument depends on their interpretation of section b that a specified date must pass without payment before the County's authority to advertise is triggered. At trial, however, the Deputy Treasurer, Evans, testified that Hawkins could have paid the delinquent taxes up until the date of the October 2 tax sale, beyond the August 31 and September 15 deadlines set in the two notices. Although we realize the County would rather not advertise until it knows the taxpayer can no longer pay the delinquent taxes, the statute does not provide that the County set a date, other than the sales date, after which the taxpayer can no longer pay his delinquent taxes before the County can begin advertising.

Based on the standing rule that the County must conduct tax sales in "strict compliance with the statutory requirements," we find that the levy notice was not properly worded, and set aside the tax sale on that basis. *Ryan; Dibble.*

### B. Restricted Delivery

■ Petitioners argue that the Court of Appeals erred in finding that a levy notice for a delinquent personal property tax sale must be sent via "restricted delivery" mail in order to be valid. We agree.

Section 12–51–40(b) provides the relevant language to resolve this issue. As discussed, this section provides that the treasurer take exclusive possession of property by sending a notice to the taxpayer. Specifically, it states,

> [i]n the case of real property, exclusive possession is taken by mailing a notice of delinquent property taxes, assessments, penalties, and costs to the defaulting taxpayer at the

address shown on the tax receipt or to a more correct address known to the officer, by "certified mail, return receipt requested—deliver to addressee only." In the case of personal property, exclusive possession is taken by mailing the notice of delinquent property taxes, assessments, penalties, and costs to the address shown on the tax receipt or to a more correct address known to the officer.... The return receipt of the "certified mail" notice is equivalent to "levying by distress."

S.C.Code Ann. § 12–51–40(b).

The Court of Appeals found that the certified mail and restricted delivery requirements listed for real property also applied to personal property based on the last sentence of section 12–51–40(b): "The return receipt of the 'certified mail' notice is equivalent to 'levying by distress.'" The Court of Appeals also relied on language in S.C.Code section 12–51–40(c) that refers to the procedure for taking possession of real and personal property *when the certified mail notice has been returned,* to find that the legislature intended for the certified mail and restricted delivery requirements for real property in section 12–51–40(b) to also apply to personal property. Although we agree that the legislature intended the certified mail requirements to apply to both real and personal property, prior versions of the statute convince us that the legislature did not intend to require notices on personal property to be mailed restricted delivery. *See* S.C.Code Ann. § 12–51–40(a) (1976); Act No. 378 at § 4, 1971 S.C. Acts 500.[6]

■ Although there is no specific mailing requirement for personal property in the statute, it appears that levy notices on personal property must be sent via certified mail, return receipt requested in order to accomplish "levy by distress." The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Charleston County Sch. Dist. v. State Budget & Control Bd.,* 313 S.C. 1, 437

---

6. The 1976 version of section 12–51–40(a) did not differentiate between personal and real property for purposes of mailing. It provided,

On or before April first next following the year in which the taxes became due mail via "Certified Mail, return receipt requested—deliver to addressee only" notice of delinquent property taxes penalties and costs, to the person at the address shown on the tax receipt or at a more correct address known to such officer.

S.E.2d 6 (1993). In our opinion, the legislature intended to be able to "levy by distress" on personal property as well as real property, and to do so requires that the notice be mailed by certified mail, return receipt requested. It is not necessary, however, that the notice be sent restricted delivery in order for the County to "levy by distress" under the terms the statute. There is no mention of restricted delivery anywhere in the statute with regard to personal property, and we do not believe the legislature intended that delinquent tax notices for personal property must be sent restricted delivery. Based on the 1976 version of the statute, it appears instead that the legislature intended to relax the notice requirements for personal property by amending the statute to require restricted delivery for real property only.

## C. Advertisement

Petitioners argue that the Court of Appeals erred in finding that the advertisement of the LadyHawk was insufficient under S.C.Code Ann. § 12–51–40(d) (Supp.1994). We agree.

"[A]ll requirements of law leading up to tax sales which are intended for the protection of the tax payer [sic] against surprise or the sacrifice of his property are to be regarded as mandatory and are strictly enforced." *Rives v. Bulsa,* 325 S.C. 287, 292–93, 478 S.E.2d 878, 881 (Ct.App.1996) (citing *Dibble,* 274 S.C. 481, 265 S.E.2d 673). South Carolina Code section 12–51–40(d) explains the procedure for advertising which the County is required to follow before selling the delinquent taxpayer's property. It provides, in relevant part,

> The property must be advertised for sale at public auction. The advertisement must be in a newspaper of general circulation ... and must be entitled "Delinquent Tax Sale." *It shall include the delinquent taxpayer's name and the description of the property, a reference to the county auditor's map-block-parcel number being sufficient for a description of realty.*

S.C.Code Ann. § 12–51–40(d) (emphasis added).

In this case, the County advertised the sale of the Lady-Hawk in the Beaufort Gazette, and included Hawkins's name and the delinquent tax number "PP550HAWALL." Before

listing the personal and real property, the advertisement indicated that the accounts beginning in "PP" referred to boats.

The Court of Appeals relied on the definition of "description" in *Black's Law Dictionary* to find this description of the LadyHawk insufficient. "A 'description' is defined as '[a] delineation or account of a particular subject by the recital of its characteristic accidents and qualities.' " *Hawkins,* 342 S.C. at 364, 536 S.E.2d at 704 (citing *Black's Law Dictionary* 445 (6th ed.1990)). The Court of Appeals reasoned that the description given by the County did not meet this definition, and further, that the description was intended to protect the taxpayer from unfair surprise and sacrifice, and as such, should have included the characteristics of the boat, such as its size. *Id.*

In our opinion, the Court of Appeals' analysis fails to explain why the listing of the taxpayer's name and tax account number, which was listed on the notices of delinquent taxes that Hawkins admitted receiving, is insufficient to alert him to the sale of the LadyHawk. Also, the Court of Appeals fails to account for the reason such a description is sufficient for real property, but is insufficient for personal property when interested persons can discover the details of both types of property by using the tax account number to look up further information in the county tax assessor's office. *See* S.C.Code Ann. § 12–51–40(d). In fact, Frank Bruno, owner of BYS, was able to discover the specific characteristics of the LadyHawk prior to the sale by entering the tax account number in the County's computer system.

We see no reason why the County should have to use a different method of describing personal property than the method the statute explicitly defines as sufficient for real property when it affords the taxpayer and potential buyer with an opportunity to look up further information. Therefore, we find that the description of the LadyHawk in the tax sale advertisement was sufficient under S.C.Code Ann. § 12–51–40(d).

## II. Judicial Estoppel

Petitioners argue that the Court of Appeals erred in failing to find Hawkins was judicially estopped from asserting

ownership of the LadyHawk for purposes of this action. We disagree.

As discussed, at some point prior to 1992, Hawkins transferred ownership of the LadyHawk to his corporation, Gryphon. Pursuant to a family court order following his divorce, in 1992, Gryphon transferred the LadyHawk back to Hawkins. Hawkins submitted a bill of sale noting this transfer of ownership to the Coast Guard, but it was not notarized, so Hawkins had to submit a second bill of sale. The Coast Guard accepted the second bill of sale despite its lack of a seller's signature, and recorded Hawkins as the record owner.

After the LadyHawk was sold to BYS, Hawkins brought an action in the Florida Federal District Court to quiet title to the boat in his name. One of the arguments Hawkins presented to the District Court was that the bill of sale from Gryphon to Hawkins was invalid, and, therefore, that Gryphon owned the LadyHawk at the time of the tax sale. If Gryphon owned the LadyHawk, the tax sale presumably would have been void because Gryphon never received a delinquent notice. The District Court dismissed the action without prejudice, holding that the court had no jurisdiction to quiet title in Hawkins's name, in part, because Hawkins claimed not to be the owner. The court stated, however, "[this] dismissal is not an adjudication of title." Subsequently, Hawkins filed this action in state court.

This Court officially recognized the validity of judicial estoppel in *Hayne Fed. Credit Union v. Bailey,* 327 S.C. 242, 489 S.E.2d 472 (1997). "Judicial estoppel precludes a party from adopting a position in conflict with one earlier taken in the same or related litigation." *Hayne,* 327 S.C. at 251, 489 S.E.2d at 477. The Court went on to enunciate the purpose of the doctrine, making clear that it is intended "to protect the integrity of courts rather than to protect litigants from allegedly improper or deceitful conduct by their adversaries." *Id.* The Court limited the doctrine to inconsistent statements of fact, holding that the doctrine does not apply to assertions of legal theories. *Id.* The Court applied judicial estoppel in *Hayne* to prevent the defendant from arguing that he was the owner of certain property when he had *successfully* disclaimed ownership of the same property during his divorce. The

defendant even admitted to lying under oath in order to protect his interest in his divorce proceeding. The Court noted, "[a]lthough parties may vigorously assert their version of the facts, they may not misrepresent those facts in order to gain advantage in the process. . . . When a party has formally asserted a certain version of the facts in litigation, he cannot later change those facts when the initial version no longer suits him." *Id.* at 252, 489 S.E.2d at 477.

The facts of this case are quite different from the situation in *Hayne.* The record on appeal does not include the transcript of the hearing before the District Court, but Hawkins's attorney stated that Hawkins did not testify before the District Court. Hawkins did not prevail in the District Court— the District Court did not quiet title in his name—by asserting Gryphon owned the LadyHawk. Judicial estoppel comes into play when the court is forced to take a position based on a factual assertion. Here, the District Court did not determine who owned the LadyHawk prior to the tax sale, and stated explicitly that its decision was not an adjudication of title. *See Zimmerman v. Central Union Bank,* 194 S.C. 518, 532, 8 S.E.2d 359, 365 (1940) ("[W]here a party assumes a certain position in a legal proceeding, and *succeeds* in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.") (emphasis added).

Further, after hearing the arguments for judicial estoppel based on the District Court action, the Master appears to have proceeded on the basis that everyone agreed that Hawkins was the real party in interest. This discussion in turn led Hawkins to abandon his argument that Gryphon was the true owner.

The question of whether title was transferred from Gryphon to Hawkins in 1992 is a legal, not a factual assertion. There is no evidence that Hawkins claimed that he had no intention of placing ownership of LadyHawk in his own name. He simply argued that the actual transfer was not effective because it was flawed. Therefore, this is not an appropriate case for judicial estoppel.

### CONCLUSION

For the foregoing reasons, we **AFFIRM AS MODIFIED** the decision of the Court of Appeals setting aside the tax sale of the LadyHawk.

WALLER, BURNETT, PLEICONES, JJ., and Acting Justice HENRY F. FLOYD, concur.