383 S.C. 334 (2009)
679 S.E.2d 913
BERKELEY COUNTY SCHOOL DISTRICT, Lexington County School District No. 1, Lexington County School District No. 4, Orangeburg County Consolidated School District Five, School District No. 1 of Spartanburg County, and School District No. 5 of Spartanburg County, Plaintiffs,
v.
SOUTH CAROLINA DEPARTMENT OF REVENUE, Defendant.
No. 26682.
Supreme Court of South Carolina.
Heard January 8, 2009.
Filed July 6, 2009.
Rehearing Denied August 6, 2009.
*336 Steve A. Matthews, Theodore B. DuBose and R. David Proffitt, all of Columbia, for Plaintiffs Berkeley County School District, Lexington County School District No. 1, and Lexington County School District No. 4.
Daniel R. McLeod, Jr., Francenia B. Heizer and Eve Ross, all of Columbia, for Plaintiffs Orangeburg County Consolidated School District Five, School District No. 1 of Spartanburg County, and School District No. 5 of Spartanburg County.
William F. Halligan and Keith R. Powell, of Columbia, for Plaintiffs Berkeley County School District, Lexington County School District No. 1, Lexington County School District No. 4, Orangeburg County Consolidated School District Five, School District No. 1 of Spartanburg County, and School District No. 5 of Spartanburg County.
Milton G. Kimpson, Ronald W. Urban, Ray N. Stevens, Harry T. Cooper, Jr. and Nicholas P. Sipe, all of Columbia, for Defendant.
Justice BEATTY:
The Plaintiffs, the above-listed school districts, filed this action for a declaratory judgment and injunctive relief in this Court's original jurisdiction pursuant to S.C. Const. art. V, § 5, S.C.Code Ann. § 14-3-310 (1976), and Rule 245 (formerly Rule 229), SCACR. The Court granted the Plaintiffs' petition and now reviews the South Carolina Department of Revenue's (the Department's) decision denying the Plaintiffs reimbursement from the Homestead Exemption Fund[1] for expenses incurred under lease-purchase and installment-purchase agreement obligations for capital improvement projects. Because these expenses are used for "school operating purposes," *337 for which owner-occupied residential property is tax exempt, we find the Plaintiffs are entitled to reimbursement for the taxes lost as a result of this exemption. Accordingly, we grant the Plaintiffs' request for a declaratory judgment.

FACTUAL/PROCEDURAL HISTORY
In past years, the Plaintiffs have entered into lease-purchase agreements and installment-purchase agreements to obtain the current use of, and as a method of financing, new and renovated school buildings and other school-related facilities. The school districts have utilized these types of agreements as alternative financing mechanisms that do not constitute "general obligation debt."[2]
Under the lease-purchase agreements, a school district would typically lease its land and buildings to a non-profit corporation for a long period of time. After execution of the year-to-year lease, the corporation would privately raise funds to finance the school renovation and construction by selling certificates of participation to investors. The school districts' payments are set at an amount sufficient to pay the principal and interest due under the certificates of participation and are made from the proceeds of school district taxes levied for general fund purposes. In a lease-purchase transaction, ownership of the facilities transfers at the end of the lease term. The agreements include a non-appropriation clause that permits the school districts to decline, without penalty, to renew *338 the annual lease by failing or refusing to appropriate necessary funds for payments.
In terms of the installment-purchase agreements, the school districts convey the existing school facilities to the non-profit corporation and lease the land on which these facilities sit to the corporation. In turn, the corporation will then issue corporate revenue bonds to fund the renovation of the existing facilities and the construction of new facilities. The school districts, instead of annual payments, make yearly purchases of an undivided partial ownership interest in certain facilities at a sale price set at an amount sufficient to pay the principal and interest due under the financial obligations issued by the corporation. Pursuant to this type of agreement, undivided partial ownership of the facilities transfers with each installment payment. The school districts use taxes levied for general fund purposes to make the annual installment purchases. These agreements include a non-appropriation clause.
In 1988 and 1994, this Court issued decisions holding that lease-purchase agreements and installment-purchase agreements do not constitute general obligation debt. Redmond v. Lexington County Sch. Dist. No. Four, 314 S.C. 431, 445 S.E.2d 441 (1994) (discussing Caddell and finding school board had authority to enter into lease-purchase agreements to build a new school without submitting the matter to voters); Caddell v. Lexington County Sch. Dist. No. 1, 296 S.C. 397, 373 S.E.2d 598 (1988) (holding that lease-purchase agreements do not constitute general obligation debt under Article X, § 15 of the South Carolina Constitution).
In 1995, the General Assembly enacted, and in 2006 amended, section 11-27-110[3] to limit lease-purchase agreements and *339 installment-purchase agreements. As a result of the 2006 amendment, the General Assembly specifically prohibited school districts from entering into such agreements without voter approval if counting the proposed transaction would cause the school district to exceed its constitutional debt limit.
In response to the General Assembly's pronouncement, the school districts continued to utilize different variations of these types of agreements as financing mechanisms that did not constitute, for constitutional purposes, general obligation debt and that did not meet the statutorily-defined criteria that the General Assembly pronounced to limit lease-purchase transactions. After an installment-purchase agreement was specifically challenged as to its constitutionality, this Court refined its analysis holding that such an agreement did not constitute a "financing agreement" as defined in section 11-27-110(A)(6) at the time the agreement was entered into. Colleton County Taxpayers Ass'n v. Sch. Dist. of Colleton County, 371 S.C. 224, 638 S.E.2d 685 (2006).
In so holding, the Court noted that section 11-27-110(A)(6) dealing with lease-purchase agreements had been substantially revised in 2006 to include and specifically define and explain lease-purchase and installment-purchase agreements entered into by school districts. Id. at 232, 638 S.E.2d at 689. Based on this amendment, the Court concluded that "[t]he portion of § 11-27-110(A)(6) currently in effect requires only that the school district use funds derived from the issuance of general obligation debt to make payments under an installment-purchase agreement. So long as the School District abides by this requirement, they have not violated the statute's requirements." Id. at 236, 638 S.E.2d at 691.
*340 In order to make payments on lease-purchase agreements, the school districts have used taxes levied on owner-occupied residential real property. Between 1995 and 2006, these properties received a property tax exemption on the first $100,000 of the property's fair market value for taxes "calculated on the school operating millage imposed for tax year 1995 or the current school operating millage, whichever is lower, excluding taxes levied for bonded indebtedness and payments pursuant to lease purchase agreements for capital construction." S.C.Code Ann. § 12-37-251(A)(1) (2000) (emphasis added).
In 2006, the General Assembly increased the amount of the tax exemption for owner-occupied residential property to "one hundred percent of the fair market value" of the property and provided the property was "exempt from all property taxes imposed for school operating purposes but not including millage imposed for the repayment of general obligation debt." S.C.Code Ann. § 12-37-220(B)(47)(a) (Supp.2007) (emphasis added). In order to reimburse school districts for the revenue lost as a result of the exemption, the General Assembly imposed an additional one percent sales tax. S.C.Code Ann. §§ 12-36-1110 to -1130 (Supp.2007) (outlining provisions for additional sales, use, and causal excise tax and directing taxes imposed under these sections to be credited to the Homestead Exemption Fund as established pursuant to section 11-11-155). In conjunction, the General Assembly established the "Homestead Exemption Fund," in which the collected funds are deposited. S.C.Code Ann. §§ 11-11-155, 12-36-1120 (Supp.2007). Section 11-11-156 sets forth a three-tier reimbursement mechanism to reimburse school districts out of the Homestead Exemption Fund for taxes lost as a result of various property tax exemptions. At issue in this case is tier three, which provides:
The tier three reimbursement is derived from revenue of the tax imposed pursuant to Article 11, Chapter 36 of Title 12, and for fiscal year 2007-2008, consists of an amount equal dollar for dollar to the revenue that would be collected by the district from property tax for school operating purposes imposed by the district on owner-occupied residential property for that fiscal year as if no reimbursed exemptions applied, plus an amount that a district may have *341 received in its fiscal year 2006-2007 reimbursements pursuant to Section 12-37-251 in excess of the computed amount of that exemption from school operating millage for that year, reduced by the total of the district's tier one and two reimbursements.
S.C.Code Ann. § 11-11-156(A)(1) (Supp.2007) (emphasis added). A district's tier three reimbursement in succeeding years is fixed at the 2007-2008 amount plus increases based on the Southeastern Consumer Price Index and population increases as determined by the Office of Research and Statistics of the State Budget and Control Board (ORS). S.C.Code Ann. § 11-11-156(A)(1), (2), (3) (Supp.2007).
Relying on this Court's decisions that lease/installment-purchase agreements do not constitute general obligation debt and their understanding that the tax reform statutes no longer exclude payments due under lease/installment-purchase agreements, the county auditors and treasurers for Berkeley County School District, Orangeburg County Consolidated School District Five, and Spartanburg County School Districts Number One and Number Five, did not levy against or collect from owner-occupied residential property owners in those districts the taxes that would otherwise have been needed for the 2007-2008 payments due under the lease-purchase and/or installment-purchase agreements. Instead, they believed their school districts would be reimbursed for the amounts not collected as a result of the exemption from funds collected by the Department pursuant to the one-percent increase in sales tax and deposited in the Homestead Exemption Fund.
In terms of the remaining two plaintiffs, the county auditor of Lexington County imposed on owner-occupied residential property an amount of taxes for fiscal year 2007-2008 necessary to make payments on the agreements of Lexington County School Districts Number One and Number Four. The county treasurer collected those taxes from owner-occupied residential property for 2007-2008 lease/installment payments of School District Number One. The portion of a countywide one-cent sales tax, collected pursuant to the Lexington County School District Property Tax Relief Act allocable to School District Number Four, was sufficient to make that District's annual lease/installment-agreement payments for fiscal year 2007-2008. The Lexington County treasurer did not collect *342 the taxes levied on owner-occupied residential property for 2007-2008 lease/installment payments of School District Number Four.
In late May 2008, ORS informed the Department that certain school districts in the state were seeking tier three reimbursements for expenses incurred under lease-purchase and installment-purchase agreement obligations for capital improvement projects.
In response, the Department issued Property Opinion # 2008-03, in which it concluded that the tier three reimbursement under section 11-11-156(A)(1) does not include millage imposed for payments due under the agreements. Specifically, the Department found:
The reimbursements under S.C.Code Ann. Section 11-11-156 (Supp.2007) for school operating purposes do not include (1) millage imposed for general obligation debt; (2) millage imposed for financing agreements as defined in Section 11-27-110(A)(6) regardless of the date the contract for the financing agreement was entered into; or (3) millage imposed for any other agreement which is in substance a financing agreement for capital improvements.
In reaching this conclusion, the Department focused its analysis on the narrow question of whether "property tax for school operating purposes" includes the millage associated with financing agreements, such as lease-purchase agreements for capital improvements. The phrase "property tax for school operating purposes" is not defined in section 11-11-156 or other provisions of the South Carolina Code. According to the Department, the phrase refers to amounts required for general day-to-day operations of a school. The Department found the phrase does not include amounts for capital improvements financed either through debt obligations such as bonds, or through other financing mechanisms such as lease-purchase agreements. The Department further reasoned that had the General Assembly intended for the term "operating" not to be significant, it would have used the phrases "school purposes" or "all school purposes."
Additionally, the Department stated that prior to the enactment of the Property Tax Reform Act, section 12-37-251(A) (2000) provided that the property tax exemption and State *343 reimbursement for $100,000 of the fair market value of legal residences did not include bonded indebtedness or lease-purchase agreements for capital construction. Thus, the Department found no reason to believe that the General Assembly intended to expand the exemption and State reimbursement in section 11-11-156 to include those items.
The Department further found that its interpretation was supported by other statutory provisions regarding millage rate increases. Specifically, the Department pointed out that S.C.Code Ann. § 6-1-320(D) (Supp.2007) states that restrictions on operating millage increases do not affect millage that is levied to pay bonded indebtedness or payments for real property purchased using a lease-purchase agreement or used to maintain a reserve account. Thus, the Department believed that millage for those items is not considered millage for "operating purposes" and school districts are still able to raise the millage to pay bonded indebtedness and lease-purchase agreements for the purchase of real property. The Department further reasoned that property taxes from all taxpayers, including property taxes for legal residences, continue to pay for capital improvements.
Finally, the Department asserted that S.C.Code Ann. § 11-27-110 (Supp.2007) treats lease-purchase agreements in the same manner as general obligation bonds subject to the constitutional debt limit. Because bonds and lease-purchase agreements are both methods of financing capital improvements, the Department found that reimbursing school districts that use lease-purchase agreements to finance capital improvements and not reimbursing school districts that use bonds to finance capital improvements would be contrary to the legislative decision to treat these methods of financing in the same manner.
The Plaintiffs challenge the Department's decision and seek a declaration from this Court, in its original jurisdiction, that the Plaintiffs are entitled to reimbursement under sections 11-11-156 and 12-37-220(B)(47)(a) for expenditures of capital construction financed using lease-purchase and installment-purchase agreements. Because the reimbursement under section 11-11-156(A)(1) for fiscal year 2007-2008 establishes the school district's "base amount" tier three payment, the Plaintiffs *344 point out that subsequent years' tier three payments will also be affected by the Department's decision.

DISCUSSION
In challenging the Department's decision, the Plaintiffs contend the plain language of section 12-37-220(B)(47)(a) precludes them from levying or collecting taxes on owner-occupied residential property for the payment of the school district's lease/installment-purchase obligations. Given that the General Assembly narrowed the exclusion from the tax exemption to only "general obligation debt," which does not include lease/installment-purchase agreements, the Plaintiffs assert that lease-purchase obligations are no longer excluded from the exemption. Conversely, the Plaintiffs claim that they may only tax owner-occupied residential property, "insofar as school taxes are concerned, for general obligation bond debt." Thus, if section 12-37-220(B)(47)(a) provides a tax exemption for lease/installment-purchase agreements, they assert that the tax revenue lost due to the exemption should be reimbursed by "tier three" of the Homestead Exemption Fund under section 11-11-156(A)(1).
"A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." Felts v. Richland County, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). The instant case primarily involves the interpretation of statutes, which are questions of law. Colleton County Taxpayers Ass'n, 371 S.C. at 231, 638 S.E.2d at 688.
Although we do not disagree with the arguments posited by the Plaintiffs, we believe the analysis in this case involves a narrow review of the specific statutes at issue and not a broad-based look at the entire statutory tax reform scheme, past and present. Because this declaratory judgment action essentially involves the statutory interpretation of sections 11-11-156(A)(1) and 12-37-220(B)(47)(a), the analysis should be confined to the specific terms of these statutes, given the exemption at issue is limited to "school operating purposes." See W. Va. Pulp & Paper Co. v. Riddock, 225 S.C. 283, 287, 82 S.E.2d 189, 190 (1954) (analyzing county tax exemption and stating "[i]t is therefore only necessary to examine the specific wording *345 of the statute, or the intent of the legislature in enacting it, in order to determine the extent of the exemption").
Taking this approach, we find the key question is what is encompassed in the exemption "from all property taxes imposed for school operating purposes" under sections 12-37-220(B)(47)(a) and 11-11-156(A)(1). This phrase, however, is not defined in either section or any other code provisions. Accordingly, we must employ the rules of statutory construction.
"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." Hawkins v. Bruno Yacht Sales, Inc., 353 S.C. 31, 39, 577 S.E.2d 202, 207 (2003). The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation. Hitachi Data Sys. Corp. v. Leatherman, 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992).
"The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." Brown v. South Carolina Dep't of Health & Envtl. Control, 348 S.C. 507, 515, 560 S.E.2d 410, 414 (2002); see Nucor Steel v. South Carolina Pub. Serv. Comm'n, 310 S.C. 539, 543, 426 S.E.2d 319, 321 (1992) (recognizing that where an agency is charged with the execution of a statute, the agency's interpretation should not be overruled without cogent reason).
Furthermore, "[t]he language of a tax exemption statute must be given its plain, ordinary meaning and must be strictly construed against the claimed exemption." Hollingsworth on Wheels, Inc. v. Greenville County Treasurer, 276 S.C. 314, 317, 278 S.E.2d 340, 342 (1981). "Where a word is not defined in a statute, our appellate courts have looked to the usual dictionary meaning to supply its meaning." Lee v. Thermal Eng'g Corp., 352 S.C. 81, 91-92, 572 S.E.2d 298, 303 (Ct.App.2002).
Relying on a 1979 definition of "operating expenses" the Department contends that "school operating purposes" encompasses "[t]hose expenses required to keep the business running, e.g. rent, electricity, heat. Expenses incurred in the *346 course of ordinary activities of an entity." Black's Law Dictionary 984 (5th ed.1979). More recently, however, Black's Law Dictionary has expanded the term and defined it as "[a]n expense incurred in running a business and producing output." Black's Law Dictionary 599 (7th ed.1999).
In light of these anomalous definitions, a determination of whether expenditures for site acquisitions and capital improvements fall under the definition of "school operating purposes" is susceptible to more than one interpretation as evidenced by the parties' divergent views. Having considered both positions in the context of a statutory construction framework, we conclude the Plaintiffs' position is logically sound and more persuasive than that of the Department.
In terms of specifics, we find payments for the lease/installment-purchase agreements should come within the definition of "school operating purposes." Clearly, a school would not be operational without an infrastructure which necessarily includes school buildings. Thus, the continued operation of a school district is dependent upon the renovation and purchase of school buildings. Because the lease/installment-purchase payments or requisite "rent payments" effectuate this goal, these payments are essential for "school operating purposes." Significantly, in the business realm, the phrase "operating expenses" has been defined to "include payroll, sales commissions, employee benefits and pension contributions, transportation and travel, amortization and depreciation, rent, repairs, and taxes, etc."[4] (emphasis added). Furthermore, to limit the definition of "school operating purposes" to only expenses incurred for the administration of a school district would be myopic. Logically, a school district cannot operate without all of its component parts, which include school administration expenses, day-to-day expenses, and most importantly the actual facilities which are funded through lease/installment-purchase payments. Thus, we find the payments for lease/installmentpurchase agreements would be exempt under section 12-37-220(B)(47)(a) and reimbursable under section 11-11-156(A)(1).
*347 We believe the legislative history of the statutes at issue supports our decision. Significantly, section 12-37-251(A), the precursor to section 12-37-220(B)(47)(a) (Supp.2007),[5] provided:
(A)(1)The Trust Fund for Tax Relief must contain an amount equal to the revenue necessary to fund a property tax exemption of one hundred thousand dollars based on the fair market value of property classified pursuant to XX-XX-XXX(c) calculated on the school operating millage imposed for tax year 1995 or the current school operating millage... excluding taxes levied for bonded indebtedness and payments pursuant to lease purchase agreements for capital construction.

S.C.Code Ann. § 12-37-251(A)(1) (2000) (emphasis added). In contrast, the version of the statute that is applicable in the instant case provides for an increased amount of the tax exemption for owner-occupied residential property to "one hundred percent of the fair market value" of the property and provided that the property was "exempt from all property taxes imposed for school operating purposes but not including millage imposed for the repayment of general obligation debt." S.C.Code Ann. § 12-37-220(B)(47)(a) (Supp.2007).
As evidenced by the above-underlined text, the General Assembly in the 2006 amendment of XX-XX-XXX(B)(47)(a) confined the exclusion from the tax exemption to only "general obligation debt," i.e., bonded indebtedness. By deleting lease-purchase agreements from the current statute, the General Assembly inferentially included these payments in the tax exemption. See Vernon v. Harleysville Mut. Cas. Co., 244 S.C. 152, 157, 135 S.E.2d 841, 844 (1964) (noting it is presumed the Legislature, in adopting an amendment to a statute, intended to make some change in the existing law); see also Denene, Inc. v. City of Charleston, 352 S.C. 208, 212, 574 S.E.2d 196, 198 (2002) (stating it must be presumed the Legislature did not intend a futile act, but rather intended its statutes to accomplish something); Stuckey v. State Budget & Control Bd., 339 S.C. 397, 403, 529 S.E.2d 706, 709 (2000) *348 (noting subsequent statutory amendment may be interpreted as clarifying original legislative intent).
Thus, by expressly excluding only general bond indebtedness from the exemption, the General Assembly by implication included the lease/installment-purchase payments within the definition of "school operating purposes." See Riverwoods, LLC v. County of Charleston, 349 S.C. 378, 384, 563 S.E.2d 651, 655 (2002) ("The canon of construction `expressio unius est exclusio alterius' or `inclusio unius est exclusio alterius' holds that `to express or include one thing implies the exclusion of another, or of the alternative. The enumeration of exclusions from the operation of a statute indicates that the statute should apply to all cases not specifically excluded. Exceptions strengthen the force of the general law and enumeration weakens it as to things not expressed.'") (citations omitted); W. Va. Pulp & Paper Co. v. Riddock, 225 S.C. 283, 288, 82 S.E.2d 189, 190 (1954) ("The inclusion in the statute of certain specified exclusions leaves the inference that the Legislature intended no other exclusions from the exemption."). Additionally, this interpretation is supported by this Court's decisions in Caddell and Colleton County Taxpayers Association which expressly differentiated lease/installment-purchase agreements from general obligation debt. Accordingly, we believe it would be contrary to the legislative intent to "add back in" payments for lease/installment-purchase agreements when the General Assembly specifically deleted them from the exclusion from the tax exemption. See Kinard v. Moore, 220 S.C. 376, 388, 68 S.E.2d 321, 325 (1951) ("The court has no right to add the words they omitted, nor to interpolate them `on conceits of symmetry and policy.'").
In addition to our review of the legislative history of the statutes at issue, we have also thoroughly considered the Department's claim that section 6-1-320 supports its position. We, however, are not persuaded by this argument. Instead, we believe this section actually bolsters the Plaintiffs' position. Section 6-1-320 specifically states that its limitations apply to "general operating purposes." S.C.Code Ann. § 6-1-320(A) (Supp.2007).[6] Significantly, this section provides for the limitation *349 upon millage rate increases to be suspended and, in turn, increased for such purposes as the purchase of capital equipment, the purchase of undeveloped real property or of the residential development rights, or payment for the occurrence of a catastrophic event. S.C.Code Ann. § 6-1-320(B)(2), (6), (7) (Supp.2008).[7] Clearly, these listed items would be considered capital improvements given that a catastrophic event such as a natural disaster would inevitably necessitate new construction. If the General Assembly did not consider these listed items to constitute "operating purposes," we believe there would be no need to allow for the suspension of the limitation upon millage rate increases for them.
Furthermore, we find the Department's reliance on section 6-1-320(D)[8] is also misplaced. This section exempts from the restrictions imposed upon millage rate increases millage that is levied for real property purchased using a lease-purchase *350 agreement, payment of bonded indebtedness, or payments to maintain a reserve account. Because section 6-1-320 addresses tax millage increases, we find it is inapplicable given the issue in the instant case involves reimbursement for taxes uncollected pursuant to state law.
Although an agency's decision should be accorded respectful consideration, we find there are cogent and compelling reasons for this Court to overrule the Department's decision. Based on the above discussion, we hold the lease/installment-purchase payments fall within the phrase "school operating purposes." Therefore, we declare that the Plaintiffs are entitled to the tier three reimbursements pursuant to section 11-11-156(A)(1) for expenses incurred for the lease/installment-purchase agreements entered into for capital construction improvements during the 2007-2008 fiscal year.
We are cognizant that our decision may have deleterious future financial consequences in terms of treating traditional general obligation debt transactions differently than alternative lease/installment-purchase agreements and establishing the base amount for tier three reimbursements. However, we are confined by the rules of statutory construction in analyzing the question presented by this declaratory judgment action. Because our role is limited to ascertaining and effectuating the intent of the General Assembly, we believe it is for the General Assembly to revise the statutes at issue to address these potential problems.[9]
DECLARATORY JUDGMENT ISSUED FOR THE PLAINTIFFS.
WALLER, J., concurs. PLEICONES, J., concurring in a separate opinion. KITTREDGE, J., dissenting in a separate opinion in which TOAL, C.J., concurs.
*351 Justice PLEICONES:
I concur in the result reached by the majority, but write separately as in my view we should answer the question posed based simply on the meaning of "school operations" as the term is used in property tax statutes. The phrase "school operating millage" is found in former S.C.Code Ann. § 12-37-251 (2000), which provided for the operation of the "Trust Fund for Tax Relief." Section 12-37-251(A)(1) specified that the Trust was to be funded in an amount necessary to fund a $100,000 exemption on certain residential property "calculated on the school operating millage ... excluding taxes levied for bonded indebtedness and payments pursuant to lease purchase agreements for capital construction ...." (emphasis supplied). In my view, the fact that these types of payments were to be excluded from the "school operating millage" calculations necessarily means that these types of payments are "school operating" expenses. When the legislature reconfigured the property tax statutes in 2006, it eliminated § 12-37-251(A)(1)[10] but added § 12-37-220(B)(47).[11] This new section provides that the full value of the qualifying residential property is now exempt "from all property taxes imposed for school operating purposes but not including millage imposed for the payment of general obligation debt." Since it is well established that debt incurred for lease-purchase agreements or installment purchase arrangements are not general obligation debt,[12] the effect of this statutory revision was to exempt the full value of qualifying residential property from taxation for lease-purchase debt, but not from that attributable to bonded indebtedness. Moreover, while S.C Code Ann. § 11-27-110 (Supp.2008) subjects school district lease-purchase agreements to the constitutional limits on general obligation debt, it cannot and does not purport to convert those obligations into general obligation debt. Cf. § 11-27-110(D)(State payment under financing agreement is deemed general obligation debt service).
*352 Accordingly, I would hold that Homestead Fund[13] tier three reimbursement under S.C.Code Ann. § 11-11-156(A)(1) (Supp.2008) includes payments made pursuant to lease-purchase agreements and other non-general obligation capital construction arrangements. I therefore concur in the result reached by the majority.
Justice KITTREDGE:
I respectfully dissent. I vote to deny tier three reimbursements to Plaintiffs. I would hold that section 12-37-220(B)(47)(a) permits school districts, through proper taxing authorities, to tax owner-occupied residential property to make payments on capital construction projects financed by lease/installment-purchase agreements. S.C.Code Ann. § 12-37-220(B)(47)(a) (Supp.2008).

I.
There are 85 school districts in South Carolina. Six of those school districts (Plaintiffs) filed this action, which the Court accepted in its original jurisdiction. To avoid the constitutional limit on general obligation debt, some school districts construct capital improvements through financing mechanisms generally referred to as lease-purchase or installment-purchase agreements.[14] A key feature of these financing mechanisms is the ability of the school districts to bypass the voters. Payments made under the lease/installment-purchase are sometimes characterized as "rent," but this characterization is a misnomer, for each payment results in the school district acquiring an ownership interest in the facilities, with full ownership vesting upon the final payment.
*353 The question before the Court concerns the proper method for acquiring tax dollars to pay for these capital financing arrangements. In 2006, the Legislature precluded school districts from entering into such financing arrangements if they would cause the school district to exceed its constitutional debt limit if considered general obligation debt. Also in 2006, the Legislature increased the tax exemption for owner-occupied residential property to "one hundred percent of the fair market value" of the property and provided the property "is exempt from all property taxes imposed for school operating purposes but not including millage imposed for the repayment of general obligation debt." S.C.Code Ann. § 12-37-220(B)(47)(a) (Supp.2008) (emphasis added).
To offset this loss of tax revenue for school operating expenses, the Legislature imposed a one percent sales tax to replace the property tax formerly levied on owner-occupied residential property. S.C.Code Ann. §§ 12-36-1110-1120 (Supp.2008). The money collected pursuant to the one percent sales tax increase is placed in the Homestead Exemption Fund and distributed to the school districts pursuant to statutory formula. S.C.Code Ann. § 12-36-1120 (Supp.2008); S.C.Code Ann. § 11-11-156 (Supp.2008).
One of the methods of distribution from the Homestead Exemption Fund is known as "tier three." Reimbursement from tier three "consists of an amount equal dollar for dollar to the revenue that would be collected by the district from property tax for school operating purposes imposed by the district on owner-occupied residential property for that fiscal year as if no reimbursed exemptions applied." S.C.Code Ann. § 11-11-156(A)(1) (Supp.2008).
Plaintiffs seek tier three reimbursement for payments made pursuant to their respective lease/installment-purchase agreements. Plaintiffs contend that these payments are included in the school operating expense exemption, and as a result, owner-occupied residential property may not be taxed for this purpose. Hence, Plaintiffs assert their entitlement to tier three reimbursements from the Homestead Exemption Fund.
The South Carolina Department of Revenue rejected tier three reimbursements and construed the statutory scheme as excluding lease/installment-purchase agreements from the *354 "school operating purposes" exemption. The Department of Revenue issued Property Opinion # 2008-03 setting forth its construction of the statutory scheme. I include that opinion in its entirety.

PROPERTY OPINION

OPINION # 2008-03

QUESTION:
Do the reimbursements for school operating purposes under S.C.Code Ann. Section 11-11-156 (Supp.2007) include (1) millage imposed for general obligation debt; (2) millage imposed for financing agreements as defined in Section 11-27-110(A)(6) regardless of the date the contract for the financing agreement was entered into; or (3) millage imposed for any other agreement which is in substance a financing agreement for capital improvements?
ANSWER:
The reimbursements under S.C.Code Ann. Section 11-11-156 (Supp.2007) for school operating purposes do not include (1) millage imposed for general obligation debt; (2) millage imposed for financing agreements as defined in Section 11-27-110(A)(6) regardless of the date the contract for the financing agreement was entered into; or (3) millage imposed for any other agreement which is in substance a financing agreement for capital improvements.
DISCUSSION:
In 2006, the Legislature enacted the Property Tax Reform Act (Act), 2006 Act No. 388. This Act substantially changed the way local school districts are funded. Under the Act, a portion of the funding previously provided by property taxes on legal residences has been shifted to the State using a 1% increase in sales tax. The mechanism for the State to reimburse school districts for the loss of property tax revenues as a result of this change is provided in Section 11-11-156. Section 11-11-156(A) provides State reimbursement for fiscal year 2007-2008 in three tiers as follows:
(1) The tier one reimbursement is based on the amount received by the district pursuant to Section 12-37-251 ($100,000 exemption for legal residences) as applied for *355 fiscal year 2006-2007. The tier one reimbursement is fixed at the fiscal year 2006-2007 amount and continues into succeeding fiscal years at this fixed amount.
(2) The tier two reimbursement is the amount to be received by the district pursuant to the provisions of Section 12-37-270 for fiscal year 2006-2007 for the school operating millage portion of the reimbursement for the homestead exemption allowed pursuant to Section 12-37-250 ($50,000 homestead exemption for residents 65 or older and individuals who are permanently disabled or legally blind). The tier two reimbursement is fixed at this fiscal year 2006-2007 amount and continues into succeeding fiscal years at this fixed amount.
(3) The tier three reimbursement consists of "an amount equal dollar for dollar to the revenue that would be collected by the district from property tax for school operating expenses imposed by the district on owner-occupied residential property for that fiscal year as if no reimbursed exemptions applied, plus an amount that a district may have received in its fiscal year 2006-2007 reimbursements pursuant to Section 12-37-251 in excess of the computed amount of that exemption from school operating millage for that year, reduced by the total of the district's tier one and tier two reimbursements."
The question before the Department is whether "property tax for school operating purposes" includes the millage associated with financing agreements, such as lease purchase agreements for capital improvements.
The term "property tax for school operating purposes" is not defined in Section 11-11-156 nor is it defined in the rest of the South Carolina Code of Laws. This term, however, does have a generally accepted meaning within the local government and legislative community. The term refers to amounts required for the general day-to-day operations of the school. It does not include amounts for capital improvements financed either through debt obligations such as bonds or through other financing mechanisms such as lease purchase agreements. The Legislature did not intend the term "operating" to be ignored. If the Legislature were referring to all property taxes used to finance schools, they *356 would have used the terms "school purposes" or "all school purposes."
Prior to the enactment of the Property Tax Reform Act, S.C.Code Ann. Section 12-37-251(A) (2000), provided the property tax exemption and State reimbursement for $100,000 of the fair market value of legal residences. That exemption and reimbursement did not include bonded indebtedness or lease purchase agreements for capital construction. There is no reason to believe that the Legislature intended to expand the exemption and State reimbursement in Section 11-11-156 to include these items.
This interpretation is supported by S.C.Code Ann. Section 6-1-320 (Supp.2007). Section 6-1-320 provides limitations on operating millage increases. Section 6-1-320(D) provides that the restrictions on operating millage increases do not "affect millage that is levied to pay bonded indebtedness or payments for real property purchased using a lease-purchase agreement or used to maintain a reserve account." In other words, millage for these items are not considered for "operating purposes" and school districts are still able to raise the millage to pay bonded indebtedness and lease purchase agreements for real property. As a result, reimbursement by the State is not necessary. Property taxes from all taxpayers, including property taxes for legal residences, continue to pay for capital improvements.
Finally, in S.C.Code Ann. Section 11-27-110 (Supp.2007) the Legislature expressed its interest in treating financing agreements, including lease purchase agreements, in the same manner as debt from bonds. Both bonds and lease purchase agreements are methods of financing capital improvements. Reimbursing districts that used lease purchase agreements to finance capital improvements and not reimbursing districts that used bonds to finance capital improvements is contrary to the legislative decision to treat these methods of financing in the same manner.
Based on the foregoing, the reimbursements provided in Section 11-11-156 do not include (1) the millage imposed for general obligation debt; (2) millage imposed for financing agreements as defined in Section 11-27-110(A)(6) regardless of the date the contract for the financing agreement *357 was entered into; or (3) any other agreement which is in substance a financing agreement for capital improvements.

II.
Plaintiffs challenge the Department of Revenue's statutory construction in this action. If payments pursuant to the lease/installment-purchase agreements are considered school operating expenses, Plaintiffs are entitled to tier three reimbursements. Conversely, if payments pursuant to the lease/installment-purchase agreements are not considered school operating expenses, owner-occupied residential property may be taxed for such purpose, and the school districts are not entitled to tier three reimbursements. A majority of the Court agrees with Plaintiffs. I do not. I believe the phrase "school operating purposes" creates no genuine ambiguity and means what it saysoperational expenses, not capital improvements.
Plaintiffs, in their brief, assert section 12-37-220(B)(47) creates an exemption for owner-occupied homeowners for "all school property taxes." Plaintiffs' brief is misleading, for the statute says no such thing. The section 12-37-220(B)(47)(a) statutory exemption is limited to property taxes for "school operating purposes," an unambiguous term excluding capital construction projects.[15]
The Court today accepts Plaintiffs' premise of an ambiguity, and construes the "school operating purposes" exemption so broadly that we must conclude the Legislature intended no bounds. The settled principle that a tax exemption must be strictly construed against the claimed exemption is ignored today. TNS Mills, Inc. v. S.C. Dep't of Revenue, 331 S.C. 611, 620, 503 S.E.2d 471, 476 (1998) ("The language of a tax exemption statute must be given its plain, ordinary meaning and must be strictly construed against the claimed exemption.").
*358 The Court takes the statutory term and exemption for "operating purposes" and instructs that "a school would not be operational without an infrastructure which necessarily includes school buildings." We learn, therefore, that the Legislature intended the acquisition of property through capital improvements (clothed as lease/installmentpurchase agreements) to be included as operating expenses, and thus subject to tier three reimbursements.
I see no reason to depart from the common understanding of "operating purposes." Moreover, I see no reason to reject the statutory construction of the Department of Revenue. See Brown v. S.C. Dep't of Health & Envtl. Control, 348 S.C. 507, 515, 560 S.E.2d 410, 414 (2002) ("The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons.") (citation omitted).
In my judgment, the Legislature has given no indication of an intent to broaden "school operating purposes" to include expenditures for capital construction under lease/installment-purchase agreements. I believe the Legislature intends the very opposite. For example, section 6-1-320 imposes limitations on a local governing body's authority to raise property tax millage rates for "general operating purposes," but the statute expressly relieves the local government from such restrictions for tax millage for lease/installment-purchase agreements: "The restriction contained in this section does not affect millage that is levied to pay bonded indebtedness or payments for real property purchased using a lease-purchase agreement...." S.C.Code Ann. § 6-1-320(D) (Supp.2008). I find it incongruous to suggest that the Legislature expressly lifted restrictions on increasing tax millage for payments on lease-purchase agreements if real property is not taxable for this purpose at all.
It is manifest in my judgment that the Legislature has authorized local governing bodies to levy taxes on real property for the payment of capital construction under lease/installment-purchase agreements. I thus believe the Department of Revenue's statutory construction is buttressed by a review of the taxing statutory scheme as a whole. In any event, were I to accept the premise of ambiguity in the phrase "school *359 operating purposes," I see no compelling reason to depart from the construction assigned by the Department of Revenue. Brown, 348 S.C. at 515, 560 S.E.2d at 414.
And finally, I observe that two of the school district plaintiffs also agree with the Department of Revenue and believe that lease-purchase agreements are not school operating expenses, and consequently are not included in the exemption. Plaintiffs Lexington County School Districts No. 1 and No. 4 levied taxes on owner-occupied residential property to make payments on lease-purchase agreements for capital construction.[16] I believe Lexington County School Districts No. 1 and No. 4 acted lawfully in taxing owner-occupied residential property to make payments on their respective lease-purchase agreements. The conduct of these school districts juxtaposed to their position in this lawsuit is troubling, at least to me.
TOAL, C.J., concurs.
NOTES
[1] S.C.Code Ann. § 11-11-155(A) (Supp.2007) ("The revenue from the tax imposed pursuant to Article 11, Chapter 36 of Title 12 is automatically credited to a fund separate and distinct from the state general fund known as the Homestead Exemption Fund."); S.C.Code Ann. § 11-11-156(A)(1) (Supp.2007) (outlining three-tier reimbursement mechanism to reimburse school districts out of the Homestead Exemption Fund for taxes lost as a result of various property tax exemptions).
[2] General obligation debt has been defined by this Court as "only debt that is `secured . . . by a pledge of the [school district's] full faith, credit and taxing power.'" Colleton County Taxpayers Ass'n v. Sch. Dist. of Colleton County, 371 S.C. 224, 234, 638 S.E.2d 685, 690 (2006) (quoting Caddell v. Lexington County Sch. Dist. No. 1, 296 S.C. 397, 400, 373 S.E.2d 598, 599 (1988)). The amount of general obligation debt that a school district may incur is constitutionally limited by Article X, section 15 of the South Carolina Constitution, which provides in pertinent part, "the governing body of any school district may incur general obligation debt in an amount not exceeding eight percent of the assessed value of all taxable property of such school district subject to the provisions of subsection (3) of this section and upon such terms and conditions as the General Assembly may prescribe." S.C. Const. art. X, § 15(6). If the school district intends to exceed this constitutionally-limited amount, a majority of the voters in the school district must provide otherwise by referendum. S.C. Const. art. X, § 15(5).
[3] Act No. 55, 1995 S.C. Acts 348; Act No. 388, 2006 S.C. Acts 3166. Section 11-27-110(C) provides:

(C) If a governmental entity described in subsection (A)(8)(b) of this section has outstanding any financing agreement, other than an enterprise financing agreement, a loan agreement for energy conservation measures as provided for in Section 48-52-650, or a lease purchase agreement for energy efficiency products as provided in Section 48-52-660, or a guaranteed energy savings contract as provided in Section 48-52-670, where no such lease agreement or contract shall constitute in any manner an agreement, consent, authority, or otherwise, to provide retail sales of energy by an energy or power provider or creates the authority to sell or provide retail energy or power, on the date of issuance of any limited bonded indebtedness pursuant to any bond act, the amount of this limited bonded indebtedness plus the amount of all other limited bonded indebtedness of the governmental entity, when added to the principal balance under any financing agreement or agreements of the governmental entity must not exceed the amount of the governmental entity's constitutional debt limit unless this bonded indebtedness is approved by a majority of the electors voting on the bonded indebtedness in a referendum duly called for this purpose by the governmental entity. This requirement applies notwithstanding any other provision of any bond act and is in addition to the terms and conditions specified in any bond act.
S.C.Code Ann. § 11-27-110(C) (Supp.2007) (emphasis added).
[4] This definition may be found at http://www.businessdictionary.com/definition/operating-expenses.html.
[5] Section 12-37-251(A) (2000) was amended by Act No. 388, 2006 S.C. Acts 3138.
[6] Section 6-1-320(A) provides in relevant part:

(A) Notwithstanding Section 12-37-251(E) a local governing body may increase the millage rate imposed for general operating purposes above the rate imposed for such purposes for the preceding tax year only to the extent of the increase in the average of the twelve monthly consumer price indices for the most recent twelve-month period consisting of January through December of the preceding calendar year, plus, beginning in 2007, the percentage increase in the previous year in the population of the entity as determined by the Office of Research and Statistics of the State Budget and Control Board.
S.C.Code Ann. § 6-1-320(A) (Supp.2007) (emphasis added).
[7] In a recent amendment, the General Assembly provided for the suspension of the limitation upon millage rate increases for such purposes as the purchase of capital equipment and the purchase of undeveloped real property or of the residential development rights. This amendment became effective on June 25, 2008. Act No. 410, 2008 S.C. Acts 4024. Thus, we recognize the Department did not have the benefit of this amendment at the time it issued its decision. Because our role is to ascertain and effectuate the intent of the General Assembly, we believe it is essential to consider this recent amendment in our attempt to discern what the General Assembly meant by the phrase "school operating purposes" given it is not defined in our code of laws.
[8] Section 6-1-320(D) provides in pertinent part:

The restriction contained in this section does not affect millage that is levied to pay bonded indebtedness or payments for real property purchased using a lease-purchase agreement or used to maintain a reserve account. Nothing in this section prohibits the use of energy-saving performance contracts as provided in Section 48-52-670.
S.C.Code Ann. § 6-1-320(D) (Supp.2007) (emphasis added).
[9] We respectfully disagree with the dissent's position which advocates a denial of tier-three reimbursements to the Plaintiffs. In order to adopt such a decision, we believe is to essentially ignore our jurisprudence regarding general obligation debt. Moreover, we decline to discount the extensive and significant legislative history of the statutes at issue in this case.
[10] 2006 Act No. 388, Pt. I, § 4.C.
[11] 2006 Act No. 388, Pt. I, § 3.
[12] Colleton Cty. Taxpayers Ass'n v. School Dist. of Colleton Cty., 371 S.C. 224, 638 S.E.2d 685 (2006).
[13] This Fund, created by 2006 Act No. 388, Pt. I, § 2. is essentially the successor to the Trust Fund.
[14] S.C. Const. art. X, § 15 (stating that "the governing body of any school district may incur general obligation debt in an amount not exceeding eight percent of the assessed value of all taxable property of such school district" but to exceed the eight percent general obligation debt limit the school district must first receive the approval of "a majority vote of the qualified electors of the school district voting in a referendum authorized by law").
[15] The South Carolina General Assembly knows how to write an unqualified property exemption. See S.C.Code Ann. § 12-37-250 (Supp.2008) (providing an unqualified homestead tax exemption for taxpayers sixty-five and older, among others). Section 12-37-220(B)(47)(a) is a qualified statutory exemption.
[16] Lexington County School District No. 1 levied and collected the taxes. Lexington County School District No. 4 levied, but did not collect, the taxes because its collection of sales tax revenue under the Lexington County School District Property Tax Relief Act, Act No. 378, 2004 S.C. Acts 3142, was sufficient to make the lease-purchase payments.